100 Cal.Rptr.2d 501 (2000)
83 Cal.App.4th 1434
ESTATE OF Myrtle Louise POWELL, Deceased.
Ronald A. Parker, as Executor, etc., Petitioner and Respondent,
v.
William C. Powell, Objector and Appellant.
No. C032008.
Court of Appeal, Third District.
September 29, 2000.
*502 Mathews & Kluck, Francis Mathews and Kelly M. Walsh, Eureka, for Objector and Appellant.
Law Office of Ronald G. Self and Ronald G. Self, San Clemente, for Petitioner and Respondent.
Certified for Partial Publication.[*]
HULL, J.
In this proceeding to probate the will of Myrtle Louise Powell, the trial court entered judgment providing that the decedent's share of community property shall remain in a revocable trust created by the decedent and her husband. Husband appeals claiming he revoked the trust after the decedent's death and is therefore entitled to the entire estate. He further contends that, in any event, community property was not properly transferred to the trust and he is entitled to a greater share of the family residence by virtue of his separate property contributions.
We conclude the trust assets, which were community property of the trustors, were transmuted to separate property upon decedent's death. Therefore, husband's revocation of the trust resulted in one-half of the trust assets being returned to husband and the other half being disposed of according to decedent's will. We also conclude the unrecorded trust instrument was sufficient as between the trustors to convert joint tenancy property assigned to the trust into community property. We reject husband's remaining claims.

Facts and Procedural History
Myrtle Louise Powell died on July 26, 1995. She was survived by her husband of over 30 years, William C. Powell, and her son from a previous marriage, Ronald Parker.[1]
Both Myrtle and William owned real property prior to their marriage which was later sold and the proceeds used to purchase or improve real property occupied by the couple during the marriage. Both spouses worked during the marriage. At one point, William received a personal injury award which he used for improvements to the couple's real property. William *503 retired in the mid-1970's; Myrtle in the early 1980's.
In 1988, Myrtle and William executed a trust (the 1988 trust), which designated Myrtle as the trustee and Ronald as a successor trustee.[2] The trust identified Myrtle and William as beneficiaries and provided that, upon the death of either trustor, the other would become the sole beneficiary. All income from trust assets was to be distributed to or for the benefit of the trustors or their survivor and, upon the death of both trustors, the trust estate was to be distributed to Ronald. Finally, the trust provided for revocation "at any time during the lifetime of Trustors...."
On March 27, 1991, Myrtle and William executed a new trust (the 1991 trust) revoking the earlier one. The 1991 trust contained essentially the same terms as the predecessor except it permitted revocation "at any time during the lifetime of either Trustor...." (Italics added.) The trust assets were listed in an attached schedule A and included real property in Weaverville, California, various stocks and bank accounts and all household items and other personal property.
On the same day the trust went into effect, Myrtle executed a will leaving all of her property to the trustee of the 1991 trust "to be held, managed, and distributed in accordance with the provisions contained therein."
At the time of Myrtle's death, July 26, 1995, the 1991 trust had not been revoked by either spouse. However, William executed a notice of revocation on July 1, 1996.[3]
On August 14, 1996, Ronald filed a petition to probate Myrtle's will. On January 17, 1997, the will was admitted to probate and Ronald was appointed executor. On August 6, 1997, Ronald filed a petition seeking to establish his rights as trustee over all trust assets existing at the time of Myrtle's death. Ronald claimed Myrtle and William had entered into an oral agreement in 1988 that the 1988 trust would become irrevocable upon the death of either spouse. Ronald further claimed the 1991 trust was executed in furtherance of that oral agreement and therefore became irrevocable upon Myrtle's death.
On April 20, 1998, William filed a petition to have Ronald replaced as executor of the will and a petition to determine title to bank accounts which had previously been established by Myrtle for the benefit of herself and Ronald.
On February 16, 1999, the trial court entered judgment finding the will and the 1991 trust valid and enforceable. The court denied Ronald's request to reform the 1991 trust to make it irrevocable upon Myrtle's death. The court further concluded William's revocation of the trust was effective only as to his half of the community assets, including half of all funds in bank accounts created by Myrtle for herself and Ronald. The court ordered the other half of the community assets to remain in the 1991 trust. The court denied *504 William's request to replace Ronald as executor. William appeals.

Discussion

I

Revocation of the Trust
William contends the trial court erred in concluding his revocation of the 1991 trust was effective only as to half of the property included therein. He argues the express terms of the instrument creating the trust permit revocation during the life of either trustor and encompass the entire trust, not merely the survivor's half.
Ronald responds that, since William has raised the issue of whether "a cotrustor may revoke a community property trust after the death of a co-trustor spouse," he "opens the door to reversal of the judgment...." Ronald requests that we reverse the judgment and find that William's attempted revocation of the trust was ineffective as to the entire trust corpus because, upon Myrtle's death, the trust became irrevocable.
Ronald cites no authority for his novel opened-door theory of appellate procedure. As a general matter, "a respondent who has not appealed from the judgment may not urge error on appeal." (California State Employees' Assn. v. State Personnel Bd. (1986) 178 Cal.App.3d 372, 382, fn. 7, 223 Cal.Rptr. 826.) Code of Civil Procedure section 906 provides a limited exception "to allow a respondent to assert a legal theory which may result in affirmance of the judgment." (178 Cal. App.3d at p. 382, fn. 7, 223 Cal.Rptr. 826.) However, in this instance, Ronald seeks reversal of the judgment and entry of a new judgment more favorable to him. Having failed to appeal, Ronald cannot seek such affirmative relief.
The question of whether revocation of the 1991 trust was effective as to the entire trust corpus, as William contends, is one of interpretation of the trust instrument. Absent a conflict in the relevant extrinsic evidence, this is a question of law which we consider de novo. (Ike v. Doolittle (1998) 61 Cal.App.4th 51, 73, 70 Cal.Rptr.2d 887.) In interpreting the trust instrument, we seek the intent of the trustors as revealed in the document considered as a whole. (Ibid.) In addition, "`[i]n interpreting, a document such as a trust, it is proper for the trial court in the first instance and the appellate court on de novo review to consider the circumstances under which the document was made so that the court may be placed in the position of the testator or trustor whose language it is interpreting, in order to determine whether the terms of the document are clear and definite, or ambiguous in some respect.'" (Ibid., quoting Wells Fargo Bank v. Marshall (1993) 20 Cal. App.4th, 447, 453, 24 Cal.Rptr.2d 507.)
The 1988 trust stated it could be revoked "at any time during the lifetime of Trustors...." This language was changed in the 1991 trust to permit revocation "at any time during the lifetime of either Trustor...." (Italics added.) Assuming the language of the 1988 trust was ambiguous as to whether the trust could be revoked by one trustor after the death of the other, this ambiguity was resolved in the 1991 trust. By permitting revocation during the lifetime of either trustor, the 1991 trust contemplated revocation by the sole survivor.
However, this does not resolve the question presented, i.e., whether revocation of the trust is effective as to the entire trust corpus or merely the revoking party's share. William argues this question is answered by Family Code section 761, subdivision (b), which reads in part: "Unless the trust instrument expressly provides otherwise, a power to revoke as to community property may be exercised by either spouse acting alone." The trust instrument here does not prohibit revocation by either spouse acting alone. On the contrary, it expressly permits it. Hence, William argues, the 1991 trust, as a whole, *505 was subject to revocation by either spouse, even after the death of the other.
William's interpretation of Family Code section 761, subdivision (b), is supported by a recent amendment to Probate Code section 15401. (Stats.1994, ch. 806, § 37.) That section governs the revocation or modification of trusts. In 1994, the Legislature added subdivision (b), which reads: "Unless otherwise provided in the instrument, if a trust is created by more than one settlor, each settlor may revoke the trust as to the portion of the trust contributed by that settlor, except as provided in Section 761 of the Family Code" (Ibid., italics added.) This amendment reversed prior judicial decisions holding that a trust could not be revoked by less than all joint settlors. (See Estate of Wernicke (1993) 16 Cal.App.4th 1069, 1073-1076, 20 Cal.Rptr.2d 481.) To give meaning to the final clause of Probate Code section 15401, subdivision (b), i.e., "except as provided in Section 761 of the Family Code," the power to revoke contained in Family Code section 761, subdivision (b), must be interpreted to cover the entire trust corpus rather than just the revoking trustor's share. (See Depper & Bernstein, Cal. Trust Administration (Cont.Ed.Bar 2000 rev.) Modification, Revocation, and Termination of Trust, § 12.18, pp. 614-615.) Hence, revocation of a joint trust by one spouse is effective as to all community property in the trust. (Fam.Code, § 761, subd. (b).) However, as to other property in the trust, revocation is effective only as to the revoking party's share of other property. (Prob.Code, § 15401, subd. (b).)
In the instant matter, the trial court found all property included in the trust at the time of Myrtle's death was community property by virtue of the long duration of the marriage and the lack of sufficient tracing evidence. As explained by the court, any property held in joint tenancy lost this character upon being included in the trust, in light of the clear intent therein to eliminate the right of survivorship. (See Civ.Code, § 683.2, subd. (d)(1); McDonald v. Morley (1940) 15 Cal.2d 409, 412, 101 P.2d 690; Re v. Re (1995) 39 Cal.App.4th 91, 96-97, 46 Cal.Rptr.2d 62.) William does not challenge this finding as lacking in evidentiary support.
However, the fact the trust assets were community property prior to Myrtle's death does not mean they retained that status at the time of revocation. At the time of Myrtle's death, Probate Code section 100 provided: "Upon the death of a married person, one-half of the community property belongs to the surviving spouse and the other half belongs to the decedent." (Stats. 1990, ch. 79, § 14, p. 470.) Thus, to the extent William and Myrtle retained reversionary property interests in the trust assets during Myrtle's lifetime by virtue of the right of revocation provided in the trust, those property interests were transmuted from community to separate property upon Myrtle's death. Under Probate Code section 15401, subdivision (b), William's revocation was therefore effective only as to his half of the trust corpus, as the trial court ruled. Myrtle's half was subject to disposition as provided in her will, i.e., in accordance with the provisions of the 1991 trust.

II

The Weaverville Residence
William contends the family residence in Weaverville was held in joint tenancy and maintained this status notwithstanding the 1991 trust because there was no recorded deed transferring the property to the trust and the trust itself was not recorded. William argues a joint tenancy in real property may not be terminated except by a recorded instrument.
William relies on Civil Code section 683.2. Subdivision (a) of section 683.2 *506 reads: "Subject to the limitations and requirements of this section, in addition to any other means by which a joint tenancy may be severed, a joint tenant may sever a joint tenancy in real property as to the joint tenant's interest without the joinder or consent of the other joint tenants by any of the following means: ¶ (1) Execution and delivery of a deed that conveys legal title to the joint tenant's interest to a third person, whether or not pursuant to an agreement that requires the third person to reconvey legal title to the joint tenant. [¶] (2) Execution of a written instrument that evidences the intent to sever the joint tenancy, including a deed that names the joint tenant as transferee, or of a written declaration that, as to the interest of the joint tenant, the joint tenancy is severed." Subdivision (c) provides that severance of a joint tenancy by written instrument is effective only if the instrument is recorded.[4]
However, this matter is governed by subdivision (d) of Civil Code section 683.2. It provides in relevant part: "Nothing in subdivision (c) limits the manner or effect of: [¶] (1) A written instrument executed by all the joint tenants that severs the joint tenancy." Under this provision, recordation is unnecessary where all joint tenants join in the execution of the written instrument. Here, the 1991 trust was executed by both Myrtle and William.
William argues the 1991 trust "is not a written instrument executed by all parties that severs the joint tenancy; it simply purports to transfer the property, unrecorded, to a trust in which the community property nature of the property continues to exist." (Original emphasis.)
This argument makes no sense. The 1991 trust was established by a written instrument which was executed by all parties. Civil Code section 683.2 does not limit the type of written instrument which will suffice. By its express terms, the 1991 trust eliminated the right of survivorship central to a joint tenancy. Thus, while it is true the community property nature of the property continued to exist after declaration of the trust, property held in joint tenancy lost this character upon being included in the trust estate.
William argues that in order to terminate the joint tenancy in the Weaverville residence, "it would have been necessary to at least record a deed from the two joint-tenants to the Trust, or to the Trustees, or at least to have recorded the trust document." Not so. The Weaverville property is expressly listed as an asset of the trust on schedule A, attached to the trust document. A declaration by the trustors that they hold property in trust for another is sufficient to transfer real property to a trust. (Prob.Code, § 15200, subd. (a); Estate of Heggstad (1993) 16 Cal.App.4th 943, 947, 20 Cal.Rptr.2d 433.) "[T]here is no requirement that the settlor/trustee execute a separate writing conveying the property to the trust." (16 Cal.App.4th at p. 948, 20 Cal.Rptr.2d 433.)[5]

*507 III-IV[**]

Disposition
The judgment is affirmed.
SIMS, Acting P.J., and NICHOLSON, J., concur.
NOTES
[*] Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts III and IV.
[1] No disrespect intended, Myrtle Powell, William Powell and Ronald Parker shall be referred to hereafter by their first names for sake of simplicity.
[2] The 1988 trust, as well as other instruments pertinent to this dispute, names Myrtle R. Powell as a party and is signed by Myrtle R. Powell. Myrtle R. Powell and Myrtle Louise Powell are the same person.
[3] Paragraph 2 of the "General Provisions" of the 1991 trust reads: "This trust may be revoked at any time during the lifetime of either Trustor by written notice delivered to the Trustee herein." The record on appeal contains a document entitled "REVOCATION OF THE DECLARATION OF TRUST FOR WILLIAM C. POWELL and MYRTLE R. POWELL REVOCABLE DECLARATION OF TRUST." This document states that William "hereby revokes the Trust dated March 27, 1991" and is signed by William. Below this is an acknowledgement of receipt of the revocation by the trustee. This too is signed by William. However, under the terms of the 1991 trust, the successor trustee is Ronald, not William. There is nothing in the record to suggest Ronald was ever served a copy of the notice of revocation. Nevertheless, Ronald does not contest William's revocation of the trust, only its effect. We shall therefore assume notice of revocation was properly served on the trustee.
[4] Civil Code section 683.2, subdivision (c), reads: "Severance of a joint tenancy of record by deed, written declaration, or other written instrument pursuant to subdivision (a) is not effective to terminate the right of survivorship of the other joint tenants as to the severing joint tenant's interest unless one of the following requirements is satisfied: [¶] (1) Before the death of the severing joint tenant, the deed, written declaration, or other written instrument effecting the severance is recorded in the county where the real property is located. [¶] (2) The deed, written declaration, or other written instrument effecting the severance is executed and acknowledged before a notary public by the severing joint tenant not earlier than three days before the death of that joint tenant and is recorded in the county where the real property is located not later than seven days after the death of the severing joint tenant."
[5] Of course, in order to be effective as to strangers, it is necessary that at least the trust instrument be recorded. (See Estate of Heggstad, supra, 16 Cal.App.4th at p. 950, fn. 7, 20 Cal.Rptr.2d 433.)
[**] See footnote *, ante.