Filed 7/11/13  Castellini v. Cunningham CA3

## NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

### (Nevada)

----

| | |
|---|---|
| GAIL CASTELLINI, as Cotrustee, etc., | C069714 |
| Plaintiff and Appellant, | (Super. Ct. No. P14621) |
| v. | |
| WILLY CUNNINGHAM, as Cotrustee, etc., | |
| Defendant and Respondent. | |

Don Cunningham (decedent) succumbed to pneumonia in December 2004 at the age of 85.  In October 2007, his daughter, Gail Castellini, filed a petition for an order instructing her (in the performance of her duties as the successor cotrustee for the Cunningham Family Trust (Trust)) to obtain an accounting from Willy Cunningham (decedent's widow and cotrustee of the Trust) from December 2004 to present; to demand that Willy[1] restore Trust assets and lodge a true copy of decedent's will (Will);

---

[1]  In keeping with the practice of the parties, we will refer to them by their given names.

1

to recover damages from Willy; and to remove Willy as a cotrustee.[2]  In her response,[3] Willy contested only the issue of whether the Trust remained revocable after the death of her husband.[4]  In December 2007, Willy lodged what she represented as being a true copy of the Will.  Willy filed a voluntary accounting in February 2008 and a restated voluntary accounting in May 2009.  In response to the instant litigation, she also filed an amendment to the Trust in May 2008 that sought to remove Gail as a successor cotrustee.

Following 10 days of trial in September 2010, the trial court issued a proposed statement of decision, entertained Gail's objections, issued a statement of decision in May 2011, vacated that decision and entertained further objections, issued a slightly different judgment in June 2011, and reiterated that judgment in September 2011 after denying a motion for new trial.  The court concluded the Trust remains revocable until the death of the surviving settlor, Willy; for this reason, Willy did not owe any duty to account to beneficiaries, her actions as trustee did not result in any damages to beneficiaries, and there was not any basis for ordering her to restore assets.  The court also found insufficient evidence to remove Willy as cotrustee.  Gail's timely notice of appeal followed.  (Briefing was completed in December 2012.)

On appeal, Gail focuses on the finding that the Trust remains revocable until Willy's death, asserting this false premise permeated the judgment and rendered its

---

[2]  Gail filed another petition in December 2007 (and a supplementary petition in December 2008) seeking a determination that a February 2003 amendment to the Trust was invalid, raising issues of mental incapacity, undue influence, and elder abuse.  At trial, Willy stipulated to the invalidity of the amendment and the trial court rejected any claim of incapacity or elder abuse.  Gail does not present any arguments about these theories on appeal.  We therefore will omit any reference to evidence involving them.

[3]  Willy also filed a petition for instructions essentially raising the same issues.

[4]  Gail had also sought a ruling that her petition did not violate the no-contest provisions of the Will and Trust.  Willy conceded the point.

findings erroneous as well. She requests we reverse the judgment with directions to order her requested relief. We shall reverse the judgment, but remand with directions to reconsider the ruling in light of this opinion.

## FACTUAL AND PROCEDURAL BACKGROUND

Willy and decedent married in 1983. Willy was 11 years his junior. He had four children from his first marriage, born between 1948 and 1954, of whom Gail is the eldest.

On March 15, 2000, decedent executed his Will. He and Willy executed the Trust on the same day.

The Will (containing 16 articles) provided that if any of its provisions conflicted with the Trust, the latter should prevail. (Art. 5.)[5] It specified that "[*a*]*ll of the property* in Schedule A of the [trust] shall be given to my wife, [Willy], *for her lifetime*. Upon her death, the remaining property listed in Schedule A, with the exception of the Certificates of Deposit at Placer-Sierra Bank, shall go to my then-living children. The Certificates of Deposit . . . shall go to my grandchildren, Laura . . . and Brian Castellini." (Art. 6, italics added.) All of the property listed in Schedule B of the Trust was to be divided among his surviving children. (Art. 6.) The remainder of his estate was to be distributed under the terms of the Trust. (Art. 9.) The Will named Gail as executor, but withheld the power to probate the Will and limited her powers to enforcing the Trust. (Arts. 12, 13.)

The Trust (in paragraphs numbered ordinally, First through Tenth) provided that the settlors "reserve the power during their lifetimes to withdraw [assets] at any time" or to revoke the Trust entirely. (Par. Second, subpar. A(1).) The Trust was to become irrevocable "[o]n the death of [the] *surviving*" settlor. (Par. Third, italics added.) As a guide for interpretation of the instrument, the Trust stated that its "primary purpose . . . is

---

**5** For clarity, we shall include references to articles of the Will and paragraphs of the Trust.

to provide for the [settlors], and the rights and interests of all others are incidental to that purpose." (Par. Sixth, subpar. E(1).) The trustees were authorized to distribute to the settlors any sums of both income and principal deemed in their discretion as being "necessary for the benefit and comfort" of the settlors. (Par. Fifth, subpar. A.)

In the provisions central to this appeal, "[o]n the death of either of the [settlors]" (par. Sixth, subpar. A), the Trust's entire balance "shall be *distributed to* the surviving [settlor], *for his or her own total and exclusive use during his or her lifetime*" (par. Sixth, subpar. (A)(2), italics added). The Trust included two provisos: " '[T]otal and exclusive use during . . . her lifetime' shall be interpreted to mean" that Willy had the right to live in the Penn Valley family residence listed in Schedule A (or rent it out should she need to move closer to her health care facility) until her death, even during decedent's lifetime. (Par. Sixth, subpar. (A)(2)(a).) Also, on the death of decedent, "all items of property listed on Schedule B hereto shall be distributed to his children . . . ." (Par. Sixth, subpar. (A)(2)(b).) "Upon the death of the last surviving [settlor]," the successor trustee must give the notice required for a trust that has become irrevocable (Prob. Code, § 16061.5),[6] distribute the Penn Valley home to the surviving children of decedent (along with decedent's "share of the remaining community property of the parties"), and distribute any property in "Schedule C" pursuant to Willy's will. (Par. Sixth, subpar. (A)(3) & (4)(a).) Gail was designated as the successor cotrustee upon the death of either settlor. All decisions regarding the Trust required the unanimous vote of all trustees. (Par. Eighth, subpars. A & B.)

Schedule A to the Trust included the Penn Valley residence, two certificates of deposit at Placer-Sierra Bank, a Kemper Passport account, and two Templeton Growth Fund accounts (with numbers ending -363 and -981). Schedule B included Canadian real

---

[6] Undesignated statutory references are to the Probate Code.

4

estate located in New Brunswick, another certificate of deposit at Placer-Sierra Bank, and gold and silver coins. It is not disputed that the assets listed in the two schedules were the separate property of decedent.[7] Schedule C included Willy's separate property.

To the extent any of decedent's children or their spouses ever spoke with him about his estate planning, they were generally aware (as Willy had written in a letter to one of them just before her marriage) that Willy was to have a life estate in the Penn Valley home, which at her death would be divided among the siblings. Attorney Sandra Stanley, who prepared the Will and Trust in 2000, testified that she would not have told decedent that his Trust would remain revocable after his death, allowing his assets to pass to Willy.

In October 2001, the balance in the Schedule B certificate of deposit (about $2,600) was withdrawn. The balances in the Schedule A certificates of deposit were withdrawn in December 2001 (about $11,200) and February 2002 (about $5,400).

In October 2002, decedent and Willy withdrew the funds from the Kemper Passport account (then valued at about $11,000) in Schedule A and opened a Pacific Life annuity. The annuity named Willy as the beneficiary, with the Trust as a contingent beneficiary. They made an initial contribution of $5,000, and the annuity account shows total contributions of about $26,000.

During a November 2002 visit from Gail while Willy was in Mexico, decedent went with Gail to his safe deposit box and made copies of the originals of the Will and Trust instruments, which he gave to her.[8] Shortly afterward, he sent Gail a copy of a

---

[7] Willy testified that she and decedent did not have any community property. Gail testified she was not aware of the character of her father's assets or the existence of any community property.

[8] Gail submitted this copy as an exhibit at trial, noting that her father's initials appeared at the bottom of each page. Although the text of the two wills is identical, a documents

5

handwritten codicil to his Will adding the names of additional grandchildren to be included in the distribution of the certificates of deposit that *had been* part of the Schedule A assets, but no longer existed.

Attorney Stanley prepared a will for Willy in September 2003. Willy did not discuss its terms with decedent. It included the disposition of a Franklin Income Fund account ending with the numbers -669 transferred from the Templeton Growth Fund account ending with -981 in Schedule A. Willy transferred title to this -669 account to herself at some unspecified point. She also included it in an updated Schedule C to the Trust instrument that she had Attorney Stanley draw up in her husband's lifetime (that she did not discuss with him). After this litigation commenced, Willy retransferred title to the -669 account to the Trust.

After her father's death, Gail learned that the bank listed as holding the certificates of deposit in Schedules A and B had written to Willy to verify that it did not have any accounts in decedent's name individually or jointly. Because Willy had not specifically asked about existing accounts in the name of the Trust, the bank did not mention them. When Gail wrote to the bank to confirm whether there were any accounts in the name of the Trust, it did not respond to her because Willy had identified herself as the sole trustee of the Trust. The bank deferred the matter to Attorney Stanley, whom Willy had told not to cooperate with Gail.

Attorney Stanley informed Gail's attorney that decedent had executed a will in February 2003 superseding the 2000 will, which named Willy as executor. Attorney Stanley asserted a copy was in her files. (At trial, Attorney Stanley could not confirm the existence of this will, because her office did not have any copy of it.) Attorney Stanley

expert testified that the fourth page of the lodged will (which includes the provision naming Gail as executor) appeared to be counterfeit, because it lacked decedent's initials and was on a different type of paper.

also testified that she had drafted the multiple versions of page four of the 2000 will reflected in the record because it had been her advice to name Willy as executor, but decedent decided on Gail. She could not explain why the version naming Willy or the counterfeit page lodged with the court naming Gail would be in Willy's possession. Although Willy testified that she had received the alternative page fours from Attorney Stanley with instructions to put the one naming her as executor into the Will because that had been her husband's intent (which Willy later replaced with the counterfeit page four, because she thought this was fraud),[9] Attorney Stanley did not have any record or recollection of advising Willy to take this action. (The trial court, in light of the evidence, reminded Attorney Stanley before her testimony of her privilege against self-incrimination.)

Attorney Stanley sent a letter to Gail's attorney in May 2005, asserting that Willy was entitled to all of the Schedule A assets "for life," and the Schedule B assets had been distributed according to the terms of the Trust. However, Attorney Stanley had not properly completed the transfer of the Canadian real estate as of that date (ultimately requiring Gail to hire attorneys to accomplish the transfer), and the Schedule B certificate of deposit (as earlier noted) did not exist any longer. In June 2005, Willy dismissed Attorney Stanley and obtained other counsel.

Gail's attorney testified he would have informed her that under the Trust Willy was entitled to the outright distribution of all of the Schedule A assets other than the house. This would accordingly have been Gail's duty as trustee.

At some point, Willy transferred title to the Templeton Growth Fund account ending with -363 in Schedule A to a new individual trust that she established in 2006.

---

[9] However, Willy did not inform anybody—including Gail—about the fraud, and she later gave the copy naming her as executor to a "senior advocate," who relied on it to accuse Gail in July 2005 of committing elder abuse.

7

She later realized this was a "mistake" and transferred title back to the Trust. As of the first quarter of 2009 (in the restated voluntary accounting), the -363 Templeton account and the -669 Franklin account had diminished from a combined total of about $193,000 in December 2004 to about $82,000. In an August 2010 brokerage statement admitted as an exhibit at trial, the combined value of a Templeton Growth Fund and a Franklin Income Fund transferred to a new broker in September 2009 from the -363 and -669 accounts was about $124,000. Title to the accounts was still in the name of the Trust as of that date.

## DISCUSSION

### I. Willy Could Not Revoke the Trust as to Decedent's Assets

#### A. *The Trust Instrument Is Not Controlling*

The trial court relied on the express language of the Trust, which declared it was revocable until the death of the surviving settlor, in finding that Willy did not have a duty to account for the assets of the Trust or to restore any assets that she had withdrawn, and that Willy's actions as trustee did not damage the remainder beneficiaries in any way. This interpretation, however, is contrary to our decision in *Estate of Powell* (2000) 83 Cal.App.4th 1434 (*Powell*).

*Powell* involved a trust containing only community assets. The trust permitted revocation during the lifetime of either settlor. On the death of the surviving settlor, the assets were to be distributed to the wife's son from her previous marriage. The wife's will devised all of her property to the trust for distribution in accordance with the trust's terms. After his wife's death, the husband purported to revoke the trust and distribute the entirety of its assets to himself. (*Powell*, *supra*, 83 Cal.App.4th at pp. 1437-1438, 1441.) In a part of our ruling not directly relevant to the present case, we noted that on the wife's death community property in the trust transmuted into equal shares of separate property of the two spouses. (*Id*. at p. 1441.) As a result, the general rule that joint trustors can

8

revoke a trust *only* as to their *own* separate property (unless the trust provides otherwise)[10] was applicable, and not the exception allowing either spouse to revoke the entirety of a trust consisting of only community property (unless the trust provides otherwise).  The widower accordingly could only revoke the trust as to his separate property and not the decedent's.  (*Powell*, at pp. 1440-1441.)

Therefore, the Trust in the present case became irrevocable with respect to the assets in Schedules A and B upon the death of decedent, because these were his separate property.  However, this is limited to the assets to which the Trust still held title at his death in December 2004.  Up until that point, decedent had retained the power to withdraw any asset from the Trust.  As the evidence demonstrates, he chose to withdraw the balance from the Kemper Passport account and the three certificates of deposit in Schedules A and B (although, curiously, he later executed a codicil regarding the nonexistent accounts).  He opened an annuity (the balance of which is mostly equivalent to all of the withdrawn funds) and chose to make Willy the beneficiary rather than the Trust.  Gail failed to produce any evidence that the withdrawals or the opening of the annuity were either without decedent's knowledge or informed consent.[11]

---

[10] At first blush, the Trust would *seem* to provide expressly that it was revocable after decedent's death.  However, as we explain later, the Trust's provisions for distribution on decedent's death are inconsistent with revocability, so we do not consider the provision for revocability until the death of the survivor to be controlling.

[11] At oral argument, Gail's appellate counsel suggested that we cannot consider the documentary evidence establishing that decedent had "adeemed" these assets before his death because the trial court did not make specific findings that the evidence was credible, and may have simply ignored the evidence as immaterial in light of its holding that the Trust was revocable.  However, because Gail did not controvert this evidence in any respect, the trial court would not have had any basis to reject it because a trier of fact cannot arbitrarily reject uncontradicted evidence that is not inherently improbable. (*Gomez v. Cecena* (1940) 15 Cal.2d 363, 366; *Matthews v. Civil Service Commission* (1958) 158 Cal.App.2d 169, 173.)  Ultimately, the point is immaterial to this appeal, because the trial court will need to take this evidence explicitly into account in

Consequently, all that remained in the Trust were the Penn Valley home and the investment accounts.[12]

Willy could not revoke the Trust as to these assets, and the interests of the beneficiaries vested at the time of decedent's death. (See *Estate of Giraldin* (2012) 55 Cal.4th 1058, 1062.) We must reverse the judgment as a result, and remand for the trial court to redetermine the remaining issues in light of our following discussion of them.

### B. Practical Consequences of Irrevocability

While Willy could not revoke the Trust as to these assets, the question remains about the manner in which the Trust directs the disposition of these assets on the death of her husband. Attorney Stanley disavowed any expertise in the field of estate planning. The wording of the Will and Trust instruments reflect this.

The Trust instrument directs that the entirety of its assets are to be "distributed" to the surviving trustor, which would by itself indicate an unrestricted right to take title in fee to the assets (which is how Gail's attorney at the time interpreted it). However, this is qualified with the language "during his or her lifetime," which suggests only a beneficial interest in a life estate (and Attorney Stanley's testimony seemed to indicate that this was the intention, as she eschewed the possibility that she would have told decedent that Willy would have the assets outright on his death). The proviso regarding the scope of this distribution with respect to the Penn Valley home, granting Willy the right to live in or rent out the home even during decedent's lifetime, could be read as limiting a life

---

determining whether there are grounds for removing Willy as trustee. (See pt. I.B.6, *post*.)

[12] As for Schedule B, title to the Canadian real property (eventually) and the gold and silver coins passed to the beneficiaries, so these assets are not of any further concern in this appeal except in connection with the beneficiaries' entitlement to damages.

estate only to the home (as opposed to the other Schedule A assets). However, we can also read it as restricting Willy from selling the home after her husband's death for her own benefit[13] and granting a right to receive rental income from the home during her husband's lifetime (which would not render the proviso surplusage). The residuary clause, which distributes the Penn Valley home and decedent's share of remaining *community* property, is equally ambiguous. The parties never had community property, and even if they did it would (as noted in *Powell*) commute to separate property. As a result, the reference to distributing *community* property is on its face a meaningless object.

We have the task of resolving these ambiguities without the aid of the trial court. We agree with Gail that the language in the Will, enacted contemporaneously with the Trust, is a proper source of guidance in the absence of any other evidence (other than the tenebrous recollection of Attorney Stanley). The Will in straightforward language creates a prototypical life estate for Willy in *all* of the Schedule A assets, with the remainder distributed on her death among the beneficiaries. Willy does not give us any cogent reason to interpret the Trust differently such that it prevails over the Will. We therefore assume the Trust intended to create a life estate by including "during his or her lifetime" in the distribution to the surviving settlor, and that the reference to remaining *community* property—rather than the remaining *separate* property—of decedent in the residuary clause was a drafting error. (Cf. *County of Sacramento v. Superior Court* (2012) 209 Cal.App.4th 776, 782 [may depart from plain statutory language if it leads to absurd

---

**13** Although Willy adverts to language that would purportedly allow the sale of the home for her support, the only explicit power to sell the home appears in the context of the need to pay taxes or the costs of administration of the Trust after the death of a settlor. (Par. Sixth, subpar. A.)

11

result].)  Accordingly, Willy does *not* have any power to take outright title to the home *or* the two investment accounts.

We thus view Gail's arguments through the lens of a vested remainder interest after Willy's life estate in these assets.  However, we also must keep in mind that the Trust grants Willy essentially unbridled discretion to distribute as much of the income *and* principal of the investment accounts as is necessary "for her benefit and comfort," in furtherance of the Trust's primary purpose of providing for the surviving settlor (rather than preserve the remainder interests of the beneficiaries in the investment accounts).

1.  Right to accounting.

Although remainder beneficiaries do not have any right to compel an annual accounting under section 16062 (*Esslinger v. Cummins* (2006) 144 Cal.App.4th 517, 526), a remainder beneficiary may make a reasonable request for information about the state of the assets of a trust and its operation, which can be enforced through court order after 60 days if ignored (*Esslinger*, at pp. 523-525; §§ 16061, 17200).  Moreover, Willy has an even broader duty under section 16060 to provide the remainder beneficiaries with sufficient information to enforce their rights or prevent any breach of the Trust.  (*Salter v. Lerner* (2009) 176 Cal.App.4th 1184, 1187-1188.)  Willy was thus obligated to provide Gail and the other beneficiaries with information about the state of Trust assets and her administration of them.  Willy did not do so until 2008 and 2009, *after* Gail was forced to bring this action under section 17200 to compel Willy to comply with this obligation.  On remand, the trial court must direct Willy to provide information as a matter of statutory duty and not mere largesse.

2.  Right to restoration of Trust assets.

Gail contends that under section 16420, she was entitled to an order directing Willy to restore assets to the Trust.  However, by the time of trial, Willy had put the investment accounts back in the name of the Trust (which also continued to hold title to

12

the Penn Valley home). Gail has not identified any other Schedule A assets that must be transferred back to the Trust, nor identified any evidence that Willy abused her discretion under the Trust in distributing sums to herself from the investment accounts for her benefit and comfort.

Gail did not demonstrate any damages flowing from the wrongful commingling of Trust assets (§ 16009) with Willy's separate property. While Gail adverts to Willy's duties to preserve assets and make them productive (§§ 16006, 16007), she does not identify any evidence that Willy ignored more profitable investment opportunities, and in any event Willy's primary duty under the terms of the Trust is the maintenance of her own comfort, not the preservation of the assets for the remainder beneficiaries.

As a result, Gail is not entitled to an order directing the restoration of any assets. The trial court shall deny this relief on remand.

3. Damages.

Although Gail claims she is entitled to recover damages on behalf of herself and the other beneficiaries from Willy's wrongful conduct, she does not suggest any causally related damages (except for speculation about the existence of other undisclosed assets that does not have any basis in the evidence), other than the costs associated with the need to bring this litigation to compel Willy to comply with her obligations under the Trust and the legal fees expended in perfecting transfer of title to the Schedule B Canadian real property (an issue we shall address subsequently). We cannot identify any. The trial court shall therefore deny this relief on remand.

4. Late lodging of the Will.

Under section 8200, the custodian of a will *must* lodge it with the superior court in which the estate will be administered within 30 days of the testator's death. A custodian who does not comply incurs liability for damages to anyone injured as a result. (See *Ahlborn v. Peters* (1940) 37 Cal.App.2d 698, 707.)

13

Willy does not dispute the existence of her duty under this statute, but makes the unavailing claim that neither Attorney Stanley nor Willy's subsequently obtained attorney informed her of this duty (both of whom had received demands for the Will to be lodged). More to the point, Willy contends Gail cannot demonstrate any damages attributable to the belated lodging of the Will. We agree. Gail had a copy of the true Will already in her possession (in the event of a will contest if Willy filed the forged will). The Will did not have any effect on the assets in the Trust or their distribution pursuant to the Trust, as it was identical to the forged will in all respects other than the identification of the executor. Gail did not have any greater rights under the Will as executor, which did not empower her to probate it and limited her duties to those of carrying out the Trust's provisions. The trial court should therefore deny relief under this statute.

5. Purported removal of Gail as cotrustee.

The trial court did not address this issue in its ultimate judgment, perhaps having concluded that the power to revoke included the power to amend the Trust to remove Gail as trustee. However, the Trust did not allow for *unilateral* action on Willy's part to amend the Trust. It required actions to have the unanimous consent of all trustees. The trial court shall therefore expressly include a ruling that Willy's attempt to amend the Trust to remove Gail was ineffective.

Willy suggests that she had good cause to remove Gail as cotrustee under section 15642, particularly on the ground of hostility or lack of cooperation among cotrustees. We are loathe to make this discretionary determination (*Estate of Gilmaker* (1962) 57 Cal.2d 627, 633) as a matter of law initially on appeal, as much as we would prefer to spare the parties the expense of further litigation. It may be that with the determination of the nature of Willy's interests in the Trust and her duties to account for Trust assets, future hostility and lack of cooperation are not likely any longer. We will therefore direct

14

the trial court to determine on the *existing* record whether there is good cause to remove Gail for this or any other reason Willy asserted at trial.

6. <u>Removal of Willy as trustee</u>.

Gail asserts that Willy's breach of her various trustee duties to the beneficiaries is grounds for removal pursuant to section 15642. The judgment stated only that there was insufficient evidence to remove Willy, without further embellishment of its reasoning.

We cannot tell if the trial court's erroneous legal conclusion regarding the Trust's revocability played any part in its finding that there was an absence of evidence to remove Willy. This would mean the trial court did not exercise informed discretion. On the other hand, it may have concluded that the inherent conflict of interest under the Trust is insufficient of itself as a ground to remove Willy in the absence of a *substantial* breach regarding the Trust (*Estate of Cairns* (2010) 188 Cal.App.4th 937, 949-950; *Copley v. Copley* (1981) 126 Cal.App.3d 248, 287), even though Willy wrongfully told the bank she was sole trustee, directed her attorney not to cooperate with Gail, participated in the presentation of a false will to Gail's attorney, and transferred title to the investment accounts to herself. Accordingly, we will leave the matter open for the trial court to reconsider on remand if it would come to a different conclusion.

## II.  Legal Fees

The trial court concluded that Gail was not entitled to recover legal fees because she did not prevail on any of her issues. This conclusion is no longer correct. Gail established that the Trust was irrevocable on the death of her father and therefore that Willy owed the beneficiaries the duties of a trustee that this litigation sought to enforce, and that Willy was limited to a life estate in the Schedule A assets (and therefore was required to keep the investment accounts in the name of the Trust). The litigation also resulted in Willy's concession that an amendment to the Trust allowing her to sell the Penn Valley home was not valid. For some reason, even though Gail also had established

15

a breach of the duty to convey clear title to the Canadian real estate to the beneficiaries, the trial court disregarded the resulting damages to the beneficiaries.

Gail contends she is entitled to recover legal fees from the Trust to the extent she has prevailed as a matter of equity (citing *Wells Fargo Bank v. Marshall* (1993) 20 Cal.App.4th 447, 458 [beneficiary vindicating status as such can recover from trust] and *Rudnick v. Rudnick* (2009) 179 Cal.App.4th 1328, 1335 [beneficiary not vindicating right to greater share properly chargeable with costs of litigation against share]). Willy does not dispute the legal basis for the claim of reimbursement of legal fees, but asserts that the bulk of the claimed fees were for issues on which Gail did not prevail.

Although we have the power to determine the amount of legal fees recoverable for litigating the matter in the trial court, the better practice is to remand to the trial court to decide the issue, including Gail's entitlement to reimbursement of appellate legal fees. (*Milman v. Shukhat* (1994) 22 Cal.App.4th 538, 546.) The award shall include the cost incurred in obtaining title to the Canadian real property.

## DISPOSITION

The judgment is reversed. The matter is remanded for the trial court to enter a new judgment in accordance with the holdings in this opinion, and to determine the extent to which Gail may recover legal fees. Neither party shall recover costs on appeal. (Cal. Rules of Court, rule 8.278(a)(5).)

_____ BUTZ _____, J.

We concur:

_____ RAYE _____, P. J.

_____ DUARTE _____, J.