RENDERED:  NOVEMBER 19, 2021; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2019-CA-0788-MR

MIKE MCINTOSH                                                          APPELLANT


APPEAL FROM HOPKINS CIRCUIT COURT
v.        HONORABLE TIMOTHY C. STARK, SPECIAL JUDGE
ACTION NO. 12-CI-00297


VALARIE BLOCK; EDWARD
BLOCK; SHEILA JACKSON; AND
HAZEL MCINTOSH, EXECUTRIX
OF THE ESTATE OF PATRICK
MCINTOSH                                                              APPELLEES


OPINION
AFFIRMING

** ** ** ** **

BEFORE:  COMBS, LAMBERT, AND K. THOMPSON, JUDGES.

THOMPSON, K., JUDGE:  Mike McIntosh appeals from the Hopkins Circuit

Court's grant of summary judgment to Valarie Block, Edward Block, and Sheila

Jackson, which dismissed Mike's claim regarding the dissipation of funds from the

William C. McIntosh and Sibyl L. McIntosh Joint Living Trust (the McIntosh Trust) and dismissed the case.

William and Sibyl McIntosh married and had four children: Michael (Mike), Patrick, Valarie, and Sheila. During the marriage, William and Sibyl lived in California, a community property state.

On December 15, 2000, William and Sibyl as grantors transferred their assets into the McIntosh Trust through a joint living trust agreement. They jointly became the trustee and the primary beneficiaries.

The assets placed into the McIntosh Trust were two single family dwellings in Apple Valley, California, one on Sitting Bull Road and another on Lakota Road (the California properties). The California properties were each originally titled as belonging to William and Sibyl "husband and wife, as Joint Tenants" and were each quitclaimed to the trust.

We summarize and quote key provisions of the McIntosh Trust:

I. provides that "[t]he purpose of this Agreement is to establish a Trust to receive and manage assets for the benefit of the Grantors during the Grantors' lifetimes, and to further manage and distribute the assets of the Trust upon the death of the surviving Grantor."

II. provides that "[a]ny community property transferred into or out of this Trust shall remain community property until the death of either Grantor[.]"

III. specifies that "[t]he Trustee shall manage and distribute the trust assets for the benefit of the Grantors and their successor(s) in interest in accordance with the terms of this Agreement."

IV. declares that "[d]uring the . . . survivor lifetimes of the Grantors, the Trustee shall pay . . . such sums from the principal as either Grantor may request at any time[.]"

V. states that upon the death of the first grantor (decedent) "the Trust shall become irrevocable with respect to the property contributed to the Trust by the Decedent . . . and shall continue for the benefit of the surviving Grantor[.]"

VI. provides for distribution of the residuary trust assets upon the surviving grantor's death in 25% shares to their four named children, with Valarie's and Sheila's shares to be reduced based upon the balance they owed the grantors.

VII. grants the trustee the power to do a variety of things including receive assets, retain assets, dispose of or encumber assets, settle claims, manage property, allocate between principal and income, distribute property, enter contracts, give loans to beneficiaries, and make distributions. Most pertinent to this suit, under subsection E. the trustee was granted extensive powers, including the power "[t]o sell . . . real . . . property" and in subsection P. "[t]o make payments to or for the benefit of any beneficiary[.]"

IX. permits the grantor to "direct any Trustee to purchase, sell, or retain any trust investment."

X. permits revocation by either grantor "at any time" and states "[i]f the Trust is revoked, the Trustee shall distribute the Trust assets to the Grantors in the same manner and amount as the Grantors contributed the property."

XI. provides that the agreement is to be construed under California law.

Schedule A lists the two single family dwellings placed in the trust and states "[d]uring the joint lives of the Grantors, any property transferred to this Trust shall retain its original character[.]"

William died in 2001. In 2003 Sibyl as trustee sold the Lakota Road property and transferred the proceeds into Valarie's personal checking account. In 2004, Sibyl as trustee sold the Sitting Bull property and received $144,000 for it. Sibyl placed these proceeds into a joint checking account she opened with Valarie and then purchased a twenty-three-and-one-half acre tract of land in Dawson Springs, Kentucky, for $94,500. Later, a mobile home was placed on this property. After Sibyl sold the Sitting Bull property, the McIntosh Trust did not have any assets as Sibyl titled the Dawson Springs property not in the McIntosh Trust, but jointly in her name with Valarie and Valarie's son, Edward, as joint tenants with

right of survivorship.[1]  Sibyl lived on the Dawson Springs property with Valarie and Edward.

On March 18, 2012, Sibyl died.  After her death, by right of survivorship the Dawson Springs property belonged to Valarie and Edward.

On April 13, 2012, Mike filed a petition to set aside conveyances and for judicial sale against Valarie, Edward, Patrick, and Sheila.[2]  Mike asserted that the net proceeds from the sale of the two properties which were in the McIntosh Trust were used to purchase the Dawson Springs property, and fund a mobile home and other enumerated personal property.  Mike argued the real estate transactions in which property was titled in Sibyl, Valarie and Edward were illegal, void, and contrary to the express language of the trust; should be set aside; and ownership should vest back in the McIntosh Trust.  He then requested this property be sold by the master commissioner, with the net proceeds to be disbursed according to the express terms and conditions of the McIntosh Trust.

---

[1] Subsequently, a one-and-one-half acre portion of this land was conveyed from Valarie and Edward to Sibyl.  Valarie states the purpose of this conveyance was to allow Sibyl to obtain a loan for a mobile home without encumbering the whole property.  Later there was a new deed conveying this portion back to Sibyl, Valarie, and Edward.

[2] American General Home Equity was originally named in this petition but is not a party to this appeal.  During the pendency of this action, Patrick died testate and his wife Hazel McIntosh as executrix and sole beneficiary of his estate was substituted as a real party in interest.  Hazel did not join in the summary judgment filings and did not file a brief on appeal.

In 2019, the parties filed cross motions for summary judgment regarding the interpretation of the McIntosh Trust pursuant to California law. The circuit court granted summary judgment in favor of the defendants, explaining that under the terms of the McIntosh Trust, while the trust was irrevocable pursuant to V.,[3] Sibyl still had unlimited power to withdraw property from the trust pursuant to IV. The circuit court concluded that under Schedule A, the community property remained community property, but the surviving grantor had unlimited power to withdraw property from the trust.

Pursuant to Kentucky Rule of Civil Procedure (CR) 56.03, summary judgment shall be rendered "if the pleadings, depositions, answers to interrogatories, stipulations, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

---

[3] The parties and the circuit court all assume that the McIntosh Trust was irrevocable. We do not read the language of the trust as making it irrevocable after William's death, as each grantor was expressly permitted to revoke the trust under X. Nor is revocation prohibited by law. *See* California Family Code (Cal. Fam. Code) § 761(b) (West 1992) (providing in part "[u]nless the trust instrument expressly provides otherwise, a power to revoke as to community property may be exercised by either spouse acting alone."); California Probate Code (Cal. Prob. Code) § 15401(b)(1) (West 1994) (providing "[u]nless otherwise provided in the instrument, if a trust is created by more than one settlor, each settlor may revoke the trust as to the portion of the trust contributed by that settlor, except as provided in Section 761 of the Family Code."). However, because Sibyl died without revoking the trust and, therefore, this issue is not directly applicable to the resolution of this appeal, we do not specifically discuss or resolve it.

"The standard of review on appeal of a summary judgment is whether the trial court correctly found that there were no genuine issues as to any material fact and that the moving party was entitled to judgment as a matter of law." *Scifres v. Kraft*, 916 S.W.2d 779, 781 (Ky.App. 1996).  Summary judgment "should only be used 'to terminate litigation when, as a matter of law, it appears that it would be impossible for the respondent to produce evidence at the trial warranting a judgment in his favor and against the movant.'" *Steelvest, Inc. v. Scansteel Service Center, Inc.*, 807 S.W.2d 476, 483 (Ky. 1991) (quoting *Paintsville Hospital Co. v. Rose*, 683 S.W.2d 255, 256 (Ky. 1985)).

Mike argues on appeal that the circuit court erred in granting summary judgment because Sibyl as trustee was not authorized to withdraw the entire corpus of the McIntosh Trust.  He alternatively argues that Sibyl could not withdraw William's half of the community property from the trust after his death because by operation of law it became William's separate property which should have been retained in the trust to effectuate his testamentary purpose of distribution to the children.

We apply California law in interpreting the McIntosh Trust. California's rules for interpreting trusts are familiar as they are in accord with ours:

> "[T]he primary rule in construction of trusts is that the court must, if possible, ascertain and effectuate the intention of the trustor or settlor." (*Ephraim v. Metropolitan Trust Co.* (1946) 28 Cal.2d 824, 834, [172

> P.2d 501].)  "The intention of the transferor as expressed in the [trust] instrument controls the legal effect of the dispositions made in the instrument."  (Prob.Code, §§ 21101, 21102.)  "The nature and extent of the rights retained by the trustor are to [be] measured by the four corners of the instrument."  (*Heifetz v. Bank of America* (1957) 147 Cal.App.2d 776, 783, [305 P.2d 979, 62 A.L.R.2d 1403] (*Heifetz*).)

*Crook v. Contreras*, 95 Cal. App. 4th 1194, 1206, 116 Cal. Rptr. 2d 319, 328 (2002).

Regarding whether the entire corpus of the trust could be withdrawn, Mike argues that William and Sibyl had testamentary intentions in creating the McIntosh Trust, with the trust being designed to address concerns William had regarding Valarie's ability to influence her mother and receive more than her intended share of their estate.  Mike states that when Sibyl delivered proceeds from the sale of the trust properties to Valarie, Sibyl violated the express terms of the trust in Section VII.P. because these proceeds went not to Sibyl, but to Valarie. Mike also asserts that a complete dissipation of all assets renders the McIntosh Trust's irrevocability a nullity.

Valarie, Edward, and Shelia argue that pursuant to the broad powers of the trust, Sibyl was authorized to withdraw all assets from the McIntosh Trust. We agree.

The trustee of the McIntosh Trust was given extensive powers over the trust assets including the power to dispose of or encumber assets, make loans,

and make distributions. Therefore, Sibyl as the surviving grantor and sole trustee had the power to use the corpus of the trust for any purpose she desired and was allowed to sell all assets of the trust for her benefit. Once she sold trust property, she could use those proceeds in any manner she desired, including giving them to Valarie and Edward. Unfortunately for Mike, whatever William's hopes may have been regarding that the children would eventually inherit trust assets, the grantors by retaining broad discretion and power in the trustee, could not guarantee that any assets would remain in the trust for distribution at the time of the last beneficiary's death.

If William and Sibyl wished to require that the trust assets continue in the McIntosh Trust for the benefit of their children, they could have done that by providing clear language that prevented the remaining trustee/beneficiary from selling the trust assets or making payments to benefit himself/herself beyond providing for necessities, or provided that the proceeds of trust assets which were sold, if used to purchase other assets, had to be titled in the trust. This was not done.

This point can be demonstrated by contrasting the language used in the McIntosh Trust with that used in the trust interpreted in *Aguilar v. Aguilar*, 168 Cal. App. 4th 35, 39-40, 85 Cal. Rptr. 3d 193, 196 (2008). There, a trust instrument executed by a married couple which was funded in part with

community property became irrevocable after the first death. The trust in *Aguilar* contained provisions stating that "the trustee had no power to 'pay to or apply for the benefit of the surviving trustor any sums out of the principal of the trust estate . . . [and] the trustee [had] no power to sell any real property held in the trust estate without the prior written consent of all the trustors' children and stepchildren[.]'" *Id.* Based on this language, the Court voided the wife's withdrawing her half of the community property which was in the trust some years after the husband's death, explaining: "Obviously, the intention of the trustors, Joe and Manuela, at the time they created the joint trust, was to make certain that the principal of the joint trust would be distributed in equal shares to the eight children and stepchildren after the death of the second trustor to die." *Id.* at 40, 85 Cal. Rptr. 3d at 196.

While we do not dispute that William may have had testamentary intentions that his remaining assets would be left to his children, the four corners of the trust show that he also intended that his wife, if she survived him, would have broad discretion to use the trust assets as she saw fit. Essentially, the settlors agreed that the remaining beneficiary as trustee had the discretion to retain the assets in the trust, in which case they would eventually be distributed to the children, or to withdraw or use the trust assets during the remaining beneficiary's lifetime.

Mike argues that pursuant to California law, upon William's death the community property in the McIntosh Trust was transmuted to separate property with Sibyl only able to withdraw her half interest and the rest vested in William's heirs. Mike relies on *In re Estate of Powell*, 83 Cal. App. 4th 1434, 100 Cal. Rptr. 2d 501 (2000), for this proposition.

Valarie, Edward, and Sheila argue that "[w]hether the Trust property retained its community property status is moot because the nature of the property does not matter after Sibyl rightfully used all assets of the trust." They interpret the language in II. that "community property transferred into or out of this Trust shall remain community property until the death of either Grantor" as meaning that "upon William's death all property would be transferred to Sibyl and any community property would become entirely owned by Sibyl pursuant to the terms of the Trust."

There is no dispute that the two dwellings acquired during William's and Sibyl's marriage and placed in the McIntosh Trust are presumed to be community property in accordance with California law. *See Estate of Mitchell*, 76 Cal. App. 4th 1378, 1385-86, 91 Cal. Rptr. 2d 192, 197 (1999); Cal. Fam. Code § 760. California probate law provides that "[u]pon the death of a married person, one-half of the community property belongs to the surviving spouse and the other

half belongs to the decedent." *Estate of Petersen*, 28 Cal. App. 4th 1742, 1746, 34 Cal. Rptr. 2d 449, 453 (1994). *See* Cal. Prob. Code § 100(a).

The question then becomes: what relevance does the trust being originally funded by community property have on what the trustee is permitted to do? The short answer is none.

Rather than looking at probate law, we examine the intentions conveyed from the wording of the trust, as it controls. In *Wood v. Brown*, 71 Cal. App. 2d 544, 162 P.2d 859 (1945), the Court had to determine how to divide a community property-funded trust between heirs of the deceased couple. It resolved this issue based on the language in the trust which specified it was to go "in equal shares per stirpes and not per capita to such persons as shall then constitute the heirs at law of the Trustors according to the laws of the State of California" rather than by applying the relevant probate code provision for distribution of community property. *Id.* at 546-50, 162 P.2d at 860-62. This resulted in a distribution in which the property went in equal shares to all heirs, even though that meant wife's sole heir received a one-sixth share, far less than the wife's half of the community property.

The resolution in *In re Estate of Powell* also does not support Mike's position. In that case, the Court was deciding whether the revocation of the trust by the surviving spouse, there the husband, who wished to have access to more

than just the income of the assets, was effective as to the entire trust corpus which was funded with community property. *In re Estate of Powell*, 83 Cal. App. 4th at 1439. Its outcome hinged on the fact that the trust instrument allowed for revocation by the surviving spouse and that the husband in fact revoked the trust. The Court concluded that:

> [T]o the extent William and Myrtle retained reversionary property interests in the trust assets during Myrtle's lifetime by virtue of the right of revocation provided in the trust, those property interests were transmuted from community to separate property upon Myrtle's death. Under Probate Code section 15401, subdivision (b), William's revocation was therefore effective only as to his half of the trust corpus, as the trial court ruled. Myrtle's half was subject to disposition as provided in her will, i.e., in accordance with the provisions of the 1991 trust.

*Id.* at 1441.

We have the opposite situation here where Sibyl never revoked the trust and the property continued to belong to the trust. It does not matter whether the property continued to be community property or became separate property upon William's death because in either form it was still the trust's property and continued to serve the purposes of the trust. The secondary beneficiaries of the McIntosh Trust could not force Sibyl as trustee to retain William's half of the property in the trust so that they could gain it after Sibyl passed away.

-13-

We acknowledge that this outcome seems unfair, that one child and grandchild should benefit over the other three children at the time of Sibyl's death, but our responsibility is to interpret the provisions of the McIntosh Trust, nothing more and nothing less. *See Tunstall v. Wells*, 144 Cal. App. 4th 554, 565-66, 50 Cal. Rptr. 3d 468, 475 (2006) (explaining that "valid . . . trusts may contain terms that might strike outside observers as unfair . . . [but] we would step dangerously outside our proper role were we to rewrite such an instrument to reflect our sense of justice" rather than "defer to [the grantors'] clearly stated intentions[.]").

Accordingly, we affirm the Hopkins Circuit Court's grant of summary judgment to Valarie, Edward, and Sheila which dismissed Mike's claim regarding dissipation of funds from the McIntosh Trust and dismissed the case.

ALL CONCUR.

BRIEF FOR APPELLANT:

Thomas E. Springer, III
Madisonville, Kentucky

BRIEF FOR APPELLEES VALARIE
BLOCK, EDWARD BLOCK, AND
SHEILA JACKSON:

Natasha Camenisch Little
John C. Whitfield
Madisonville, Kentucky