Filed 6/15/16  Fluharty v. Kennedy CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| CHARLES FLUHARTY et al.,<br><br>    Plaintiffs and Appellants,<br><br>        v.<br><br>JAMES KENNEDY, as Successor Trustee, etc.,<br><br>    Defendant and Respondent. | F072274<br><br>(Super. Ct. No. PB62465)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  Ralph W. Wyatt, Judge.

Clifford & Brown, Robert D. Harding, Stephen H. Boyle and John R. Szewczyk for Plaintiffs and Appellants.

Lynch and Lynch and Craig M. Lynch for Defendant and Respondent.

-ooOoo-

In this probate dispute relating to a 2006 revocable living trust (the 2006 trust) established by Robert Lee Hunsaker and Anna Ruth Hunsaker, husband and wife, the primary issue is whether the 2006 trust became irrevocable upon the death of the first spouse to die, or whether it remained revocable by the surviving spouse. Here, Anna died in September 2006. Robert subsequently transferred the trust assets into a new trust created by him in 2008 (the 2008 trust). Several years later, after Robert died, Charles Fluharty and Christopher Fluharty, as cotrustees of the 2008 trust (appellants), proceeded to carry out the terms of the 2008 trust, including the conveyance of the settlors' former real property in Tehachapi (the Tehachapi home) to Christopher Fluharty.[1] In reaction, James Kennedy, as trustee of the 2006 trust (respondent), filed a petition in the trial court, seeking a ruling that the 2006 trust became irrevocable at the time Anna died, and requesting an order that appellants restore to the 2006 trust all of the property (including the Tehachapi home) that had been moved to the 2008 trust. The trial court agreed with respondent's position and ordered the requested relief. Appellants appeal, arguing that the trial court misconstrued the 2006 trust and failed to apply statutory rules pertaining to the revocability of trusts. Based on our application of the relevant statutory provisions to the language of the 2006 trust, we agree with appellants that Robert had a right to revoke his share of the trust assets. Therefore, we reverse the judgment of the trial court and remand the matter to the trial court for further proceedings consistent with this opinion.[2]

---

[1] The makers of a trust are commonly called the settlors or trustors of the trust. When we refer to the settlors herein, we mean Robert Lee Hunsaker and Anna Ruth Hunsaker, in their particular roles as creators of the 2006 trust.

[2] Although we reverse the judgment, our reversal will leave intact certain aspects of the trial court's ruling.

## FACTS AND PROCEDURAL HISTORY

The 2006 trust, also known as the Hunsaker Family Trust, was executed by Robert and Anna on January 31, 2006. Thus, both spouses were the settlors of the 2006 trust. The 2006 trust was funded with various assets listed on schedule "A" of the trust, which assets included the real property situated on Pinedale Drive in Tehachapi, California (the Tehachapi home) and several bank accounts. The 2006 trust document was prepared by Robert Kennedy, the brother of respondent. Concurrent with signing the 2006 trust, Robert and Anna each executed a last will and testament. In paragraph sixth of their wills, each spouse confirmed to the other his or her share of community property and stated that the testator's share of the community property plus any separate property would pass to the 2006 trust.

The 2006 trust addresses the matter of the settlors' ability to revoke the trust; however, unfortunately, it says almost nothing about irrevocability. Article V of the 2006 trust, under the heading "REVOCATION AND AMENDMENT," provides for the revocation, modification or amendment of the trust during the joint lifetimes of the settlors (who are referred to in the trust as "the Undersigned") by decision expressed in a written instrument signed by the settlors. Specifically, paragraphs A, B, and C of article V of the 2006 trust state as follows:

> "A.    As long as the Undersigned are both alive, they reserve the right, without the consent or approval of any other, to amend, modify or revoke the Trust under this Agreement, in whole or in part, concerning the property that each has contributed to the Trust, in whole or in part, including the principal and the present or past undisbursed income from such principal. Such revocation shall be by an instrument in writing signed by the Undersigned and shall be effective upon signing without notice to any successor Trustee.

> "B.    While this Trust remains revocable, either of the Undersigned may, in their sole discretion, make such use of the funds or properties of these Trusts as they may deem prudent, and such use shall be deemed to

3.

have been made with the consent and approval of the Trustee as though a formal writing were submitted in accordance with the provisions above.

"C. The interest of the beneficiaries is a present interest which shall continue until this Trust is revoked or terminated other than by death. As long as this Trust subsists, the Trust properties and all rights and privileges thereunder shall be controlled and exercised by the Trustee(s) named herein."

The only other provision of the 2006 trust expressly referring to revocability or irrevocability is article X, the "SPENDTHRIFT PROVISION," which includes the following, isolated statement: "After the Trust(s) created herein becomes irrevocable, the interest of each beneficiary in income and principal shall be free from the control or interference of any creditor .…" Although this provision does indicate an assumption that the 2006 trust would *eventually* become irrevocable, there is no explicit statement of any criteria, event, occurrence or point-in-time wherein the trust would be made irrevocable. And nothing is said elsewhere in the 2006 trust that would expressly make the trust irrevocable.

As to trust administration while one or both of the settlors were still alive, the 2006 trust was to be administered in accordance with the provisions of article XIX regarding distribution of income and principal of the trust. Article XIX states, in part, as follows: "During the life of the Undersigned, the Trustees, or the survivor, shall hold, manage, invest and reinvest the Trust Estate, and shall collect the income thereof and shall dispose of the net income and principal as follows: [¶] A. Income. The Trustee(s) shall pay to the Undersigned all of the net income of this Trust, in monthly or other convenient installments, but at least annually. [¶] B. Principal. The Trustees may, in their sole discretion, pay or apply for the benefit of the Undersigned, in addition to the income payments herein provided for, such amounts of the principal of the Trust Estate, up to the whole thereof, as the Trustees may from time to time deem necessary or advisable for the use and benefit of the Undersigned."

Finally, under the terms of the 2006 trust, after the deaths of both settlors and after payment of all estate taxes, burial and funeral expenses, etc., the remainder of the trust

estate, including the Tehachapi home and other trust assets, was to be divided into three equal shares or trusts for the benefit of, or for distribution to, the following trust beneficiaries: Charles Fluharty, Jean Ann Kennedy and Stephen Hunsaker. (See arts. XX and XXI of the 2006 trust).[3] The persons named to serve as trustees of the 2006 trust, in their stated order of succession, were: (1) Robert Lee Hunsaker and Anna Ruth Hunsaker during their lifetimes; (2) the survivor of Robert Lee Hunsaker and Anna Ruth Hunsaker; (3) Charles Fluharty and James Kennedy, as successor cotrustees; (4) the survivor of Charles Fluharty and James Kennedy; (5) a trustee chosen by a majority of beneficiaries.

Anna died on September 12, 2006. On February 7, 2008, about 17 months after Anna's death, Robert created a new trust entitled the Robert Lee Hunsaker Revocable Living Trust, which is referred to herein as the 2008 trust. The 2008 trust included a schedule "A" listing of trust assets, which described some or all of the assets that were originally placed in the 2006 trust, including the Tehachapi home and several bank accounts. At the time he executed the 2008 trust, Robert also executed a grant deed transferring title of the Tehachapi home to the 2008 trust, which deed was recorded the following month. The distribution provision of the original version of the 2008 trust differed from the 2006 trust by providing that one-third of all bank accounts would first be gifted to Robert's son, Stephen Hunsaker, and then the residue of the trust estate would be divided into equal shares among Charles Fluharty, Jean Ann Kennedy and Stephen Hunsaker.

On December 6, 2011, Robert executed an amendment to the 2008 trust. In the amendment, Charles Fluharty and Christopher Fluharty were named successor cotrustees

---

[3] Article XXIII of the 2006 trust included a summary of the living children of the settlors. Beneficiaries Charles Fluharty and Jean Ann Kennedy are Anna's children, and Stephen Hunsaker is the son of Robert and Anna. We note also that Jean Ann Kennedy is the wife of James Kennedy, respondent herein.

of the 2008 trust. A new distribution provision was added, and the former distribution provision was deleted. As so amended, the 2008 trust provided that upon Robert's death, the Tehachapi home would be distributed outright to the trustor's grandson, Christopher Fluharty, and the remainder of the trust estate would be divided equally between Charles Fluharty, Jean Ann Kennedy and Stephen Hunsaker.

Concurrent with the execution of the amendment to the 2008 trust, Robert also executed a new last will and testament in 2011, which directed that all of his property was to go into the 2008 trust.

Robert died on August 14, 2012.

On September 4, 2012, respondent, in his capacity as trustee of the 2006 trust, sent a letter to Charles Fluharty, insisting that the 2006 trust remained in effect and that it (*not* the 2008 trust, the existence of which respondent had recently learned) governed the property disposition. Respondent demanded that the Tehachapi home be transferred back into the 2006 trust from the 2008 trust forthwith. Further, respondent's letter articulated his position that once Anna died on September 12, 2006, the 2006 trust became fixed and could not be undone through removal of the property.

Appellants and respondents respectively hired attorneys and a series of letters and demands were exchanged between them, but their dispute concerning the competing trusts was not resolved. On October 25, 2012, appellants, in their capacity as successor cotrustees of the 2008 trust, executed a quitclaim deed dated October 25, 2012, to convey the Tehachapi home to Christopher Fluharty, as provided in the 2008 trust. The quitclaim deed was recorded on November 8, 2012.

On January 4, 2013, respondent filed his petition in the trial court seeking declaratory relief, an accounting, and other relief, including a judicial determination that the 2006 trust remained the operative trust, and an order canceling the quitclaim deed and requiring appellants to return trust property to the 2006 trust. In a nutshell, respondent's position was that when Anna died on September 12, 2006, the 2006 trust became

6.

irrevocable and, therefore, Robert did not have the power to transfer the trust assets into the 2008 trust. The petition was verified and included as exhibits, copies of the 2006 trust, the 2006 wills of both Robert and Anna, the 2008 trust, including the 2011 amendment thereto, the 2011 last will and testament of Robert, and the recorded 2012 quitclaim deed to the Tehachapi home.

Trial was held on October 14, 2014. During the trial, the attorney who drafted the 2006 trust did not testify, and no testimony was provided as to the intent of the settlors in creating the 2006 trust. Brief testimony was presented by Jean Ann Kennedy, Stephen Hunsaker, Charles Fluharty, and Attorney Phillip Darling (who drafted the 2011 amendment to the 2008 trust). The parties also submitted a written stipulation of certain undisputed facts.

The trial court issued its final written ruling on the matter on May 19, 2015, adopting what had been its tentative decision and order. Among other things, the trial court determined: (1) the 2006 trust became irrevocable upon Anna's death on September 12, 2006, (2) the 2008 trust (including its 2011 amendment) did not supplant the 2006 trust, and (3) the 2008 trust was improperly funded with assets stripped from the 2006 trust. In finding that the 2006 trust was irrevocable upon the death of the first spouse, the trial court recited, but did not discuss, articles V (revocation and amendment) and X (spendthrift provision) of the 2006 trust. The trial court also noted that Robert did not execute a written notice of revocation. In the end, the trial court granted all of the relief sought by respondent.

Appellants timely filed a notice of appeal.

## DISCUSSION

### I. Standard of Review

Appellants argue the trial court failed to apply relevant statutory law or applied the wrong legal standard when it interpreted the 2006 trust. Of course, questions of statutory interpretation or of the appropriate legal standard to be applied are legal issues that we review de novo. (*Harustak v. Wilkins* (2000) 84 Cal.App.4th 208, 212.) Additionally, it is a judicial function to interpret a written instrument unless the interpretation turns on the credibility of extrinsic evidence. (*Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865.) Here, the material facts were not in dispute, nor was there any extrinsic evidence relating to the interpretation of the 2006 trust. Therefore, it becomes our task to review the interpretation of the 2006 trust independently. (*Estate of Dodge* (1971) 6 Cal.3d 311, 318; *Estate of Powell* (2000) 83 Cal.App.4th 1434, 1439–1440 (*Powell*).)

### II. Statutory Law on the Revocability of Trusts

Probate Code section 15400 creates a general presumption that trusts are revocable, stating that "[u]nless a trust is expressly made irrevocable by the trust instrument, the trust is revocable by the settlor."[4] Although the force of this rule may readily lead to a conclusion that a trust is revocable by a settlor, the implications of that revocability are somewhat more complicated where (as here) the trust was created by more than one settlor. Regarding that particular situation, section 15401, subdivision (b)(1), provides: "Unless otherwise provided in the instrument, if a trust is created by more than one settlor, each settlor may revoke the trust as to the portion of the trust contributed by that settlor, except as provided in Section 761 of the Family Code." Reading the above quoted statutory provisions together, the current rule may be fairly summarized as follows: Where a trust is not expressly made irrevocable, it is presumed to be revocable by the settlor, but if there is more than one settlor, the presumption of

---

[4] Unless otherwise indicated, all further statutory references are to the Probate Code.

8.

revocability applies only to "the portion of the trust contributed by that settlor" unless "otherwise provided" in the trust instrument. (§§ 15400, 15401, subd. (b)(1).)

The application of the above rule in the present case is not inconsistent with Family Code section 761.[5] Family Code section 761, subdivision (b), provides: "Unless the trust instrument expressly provides otherwise, a power to revoke as to community property may be exercised by either spouse acting alone. Community property, including any income or appreciation, that is distributed or withdrawn from a trust by revocation, power of withdrawal, or otherwise, remains community property unless there is a valid transmutation of the property at the time of distribution or withdrawal." As its wording indicates, a significant concern of this Family Code provision is to protect the right of each spouse regarding community property placed in a joint revocable trust during their marriage, establishing a unilateral right of either spouse to revoke the trust and withdraw the entire community property unless the trust otherwise provides. In *Powell*, *supra*, 84 Cal.App.4th at pages 1440–1441, a case that likewise involved a revocable living trust created by a husband and wife where the husband revoked the trust after his wife's death, the Court of Appeal explained that although the power to revoke under Family Code section 761, subdivision (b), is effective as to *all* community property in the trust at the time of revocation, "the fact the trust assets were community property prior to [the wife's] death does not mean they retained that status at the time of revocation." (*Powell*, *supra*, at p. 1441.) Once the wife died in that case, by operation of law one-half of the community property would belong to the surviving spouse and the other half would

<hr>

[5] Family Code section 761, subdivision (a), provides: "Unless the trust instrument … expressly provides otherwise, community property that is transferred in trust remains community property during the marriage …, if the trust … provides that the trust is revocable as to that property during the marriage and the power, if any, to modify the trust as to the rights and interests in that property during the marriage may be exercised only with the joinder or consent of both spouses." This subdivision of Family Code section 761 does not directly impact the issues at hand.

belong to the decedent. (*Ibid*., citing § 100.)**6** Accordingly, since the husband revoked the trust *after* his wife's death, section 15401, former subdivision (b) (now subd. (b)(1)), provided the applicable rule, and the husband's revocation was deemed effective only as to *his one-half share* of what had been community property in the trust. (*Powell*, *supra*, at p. 1441 [revocation held effective "only as to his half of the trust corpus"].)

We note the conclusion in *Powell*, that the surviving spouse in that case could only revoke the joint trust as to his half of the trust property, created some uncertainty in the law whether (or when) a surviving spouse could have the power to revoke as to the other spouse's share of the property in the trust. In 2012, the Legislature clarified the law by adding a new provision to section 15401, enacted as subdivision (b)(2) thereof, which provides: "Notwithstanding paragraph (1), a settlor may grant to another person, including, but not limited to, his or her spouse, a power to revoke all or part of that portion of the trust contributed by that settlor, regardless of whether that portion was separate property or community property of that settlor, and regardless of whether that power to revoke is exercisable during the lifetime of that settlor or continues after the death of that settlor, or both." (Stats. 2012, ch. 55, § 1, eff. Jan. 1, 2013.) Among other things, this added provision clarified that "a settlor can grant a spouse or other party a power of revocation over the settlor's property in a joint trust and that that power can continue after the death of the settlor." (Sen. Jud. Com., Assem. Bill No. 1683, June 12, 2012, p. 5.)

### III. Continuing Right of Surviving Settlor to Revoke

As summarized above, the basic statutory rule is that, in the absence of express language in the trust instrument making the trust irrevocable, a trust is revocable by the settlor (§ 15400); and where there is more than one settlor, the right of revocation exists

---

**6** Section 100, subdivision (a), states: "Upon the death of a married person, one-half of the community property belongs to the surviving spouse and the other half belongs to the decedent."

as to "the portion of the trust contributed by that settlor," unless the trust otherwise provides (§ 15401, subd. (b)(1)). Further, where the revoking party is the surviving spouse and cosettlor of a joint revocable trust entered into during the marriage, the right of revocation under section 15401, subdivision (b)(1), consists of the revoking party's one-half share of both spouses' community property contribution to the trust (*Powell*, *supra*, 83 Cal.App.4th at pp. 1440–1441), unless the trust otherwise provides.[7]

We now apply these principles to the present case. Article V of the 2006 trust both reserved a right to revoke or amend the trust and provided a means for doing so during the settlors' joint lifetimes, stating that "As long as the Undersigned are both alive, they reserve the right … to amend, modify or revoke the Trust … concerning the property that each has contributed to the Trust …." This right to revoke or amend during the settlors' lifetimes could be implemented by an instrument in writing signed by the settlors. The critical wording "as long as the Undersigned are both alive," while confirming the settlors' right to revoke while they were both alive, did not *expressly* restrict revocation on the part of a surviving spouse nor did it declare the trust to be irrevocable once the first spouse died. In other words, even though the 2006 trust did not explicitly reserve a right of revocation in the surviving spouse, it also did not expressly preclude revocation by the surviving spouse. On the latter issue, the trust instrument was silent. In short, the 2006 trust did not in any of its terms or provisions expressly make the trust irrevocable.

When section 15400 states the rule that "[u]nless a trust is *expressly* made irrevocable" (italics added), it is revocable by the settlor, the word "'expressly'" has been construed to mean "'distinctly, clearly, unmistakably, or in direct terms, as distinguished from impliedly or inferentially.'" (*Wells Fargo Bank American Trust Co. v. Greuner*

_____

[7] Of course, the revoking party's share would also include any separate property contributed to the trust by that party as well.

(1964) 226 Cal.App.2d 454, 459 [construing Civ. Code, former § 2280, now Prob. Code, § 15400].) In the 2006 trust, this was not done. Because the 2006 trust was not expressly made irrevocable, we conclude the presumption of revocability governs and the trust was revocable by Robert after Anna's death. (§ 15400.) At the same time, because there was more than one settlor and the trust did not provide for a more extensive power of revocation, we further conclude that the right of revocation did not extend to all of the trust corpus, but only to Robert's share or contribution. (Prob. Code, § 15401, subd. (b)(1); see *Powell*, *supra*, 83 Cal.App.4th at pp. 1440–1441; see also Fam. Code, § 761, subd. (b).)[8] Assuming the 2006 trust consisted solely of community property contributions, then Robert was entitled to revoke only one-half of the trust corpus. (*Powell*, *supra*, at pp. 1440–1441.)

Respondent disagrees that *any* revocation took place, arguing that the *entire* 2006 trust became irrevocable upon Anna's death. In an effort to support that position, respondent relies on *Estate of Khan* (1985) 168 Cal.App.3d 270 (*Kahn*) and *Estate of Wernicke* (1993) 16 Cal.App.4th 1069 (*Wernicke*). As we explain below, neither case requires a different conclusion than the one we have articulated above.

In *Khan*, the sole issue on appeal was whether a cosettlor of a trust could unilaterally revoke the trust. (*Kahn*, *supra*, 168 Cal.App.3d at p. 271.) The trust involved in that case was a revocable living trust between a husband and wife that included language very similar to article V of the 2006 trust now before us. In *Khan*, the husband served a notice of revocation of trust to his wife's attorney after his wife had initiated marital dissolution proceedings, and the question on appeal was whether he had a right to revoke the trust without his wife's assent. Alluding to *Hill v. Conover* (1961)

---

**8** The 2006 trust could have expressly provided otherwise (see § 15401, subd. (b)(1) [rule applies "[u]nless otherwise provided"] & subd. (b)(2) [a power of revocation as to a particular settlor's property may be granted in the trust]). That is, it could have provided that either settlor could revoke as to the *entirety* of the trust assets contributed by both settlors, but it did not do so.

191 Cal.App.2d 171 (*Hill*), an earlier precedent construing Civil Code former section 2280 (the precursor to Prob. Code, § 15400), *Khan* cited with approval the statutory construction indicated in *Hill* that where there are multiple settlors of a trust, unilateral revocation is not possible unless the trust so provides. (*Khan*, *supra*, at p. 273.) In passing, *Khan* also noted that multiple settlors can "by mutual agreement provide for other modes of revocation" (*id*. at p. 274), but found the settlors had not done so in that case because the trust's revocation provision was expressed entirely in the plural, "thereby evincing an intent, consistent with California law, that revocation could only be accomplished mutually" (*ibid*.).

In *Wernicke*, a trust was entered into by five family members, none of whom were married to each other and each contributed separate property. (*Wernicke*, *supra*, 16 Cal.App.4th at pp. 1073, 1076, fn. 7.) One of the five cosettlors sought to unilaterally revoke the trust as to his contributed share of the trust corpus. The trial court allowed the revocation to occur, and that decision was appealed. In its analysis of the issue, the Court of Appeal noted that when the Legislature enacted Probate Code section 15400, it restated Civil Code former section 2280 without substantive change. The Legislature, in so doing, was presumed to have approved of the prior judicial construction of that statutory provision, including as set forth in *Hill* and *Khan*. Therefore, the judicial construction adopted in those cases continued to apply, which was that "a single settlor of a multisettlor trust could not unilaterally revoke the trust as to his contributed share of capital merely because the trust was presumptively revocable under Civil Code former section 2280 [now Prob. Code, § 15400]." (*Wernicke*, *supra*, 16 Cal.App.4th at p. 1075.) Accordingly, the judgment of the trial court was reversed. In a brief synopsis of its ruling, the court stated: "Can one of several cotrustors unilaterally revoke a trust which is made presumptively revocable by statute as to the portion of the corpus he contributed? … [C]urrent California law says 'no.'" (*Id*. at p. 1071.)

13.

In 1994, after *Wernicke*, the Legislature added subdivision (b) to section 15401 (see Stats. 1994, ch. 806, § 37), now subdivision (b)(1) of that section. As correctly observed in *Powell*, *supra*, 83 Cal.App.4th at page 1440, the new wording "reversed prior judicial decisions holding that a trust could not be revoked by less than all joint settlors." Thus, contrary to the legal background that existed in *Khan* and *Wernicke*, current law no longer presumes that in the absence of language to the contrary, a trust created by multiple settlors can be revoked only by joint action of all of the settlors. (See Prob. Code, § 15401, subd. (b)(1); Fam. Code, § 761, subd. (b).) Instead, the law now presumes exactly the opposite. As is plainly stated in section 15401, subdivision (b)(1): "Unless otherwise provided in the instrument, if a trust is created by more than one settlor, each settlor may revoke the trust as to the portion of the trust contributed by that settlor, except as provided in Section 761 of the Family Code." Consequently, *Wernicke* and *Khan* no longer reflect the current statutory law regarding the revocability of multi-settlor trusts and do not impact our decision.

## IV.     Method of Revocation

As part of its findings, the trial court held there was no evidence that Robert ever executed a notice of revocation for the 2006 trust. To the extent the trial court required a formal notice of revocation as a prerequisite for revocation in this case, that was error. In any event, it is clear that Robert successfully carried out his intention to revoke.

Section 15401, subdivision (a), provides the methods by which a revocable trust may be revoked: "A trust that is revocable by the settlor or any other person may be revoked in whole or in part by any of the following methods: [¶] (1) By compliance with any method of revocation provided in the trust instrument. [¶] (2) By a writing, other than a will, signed by the settlor or any other person holding the power of revocation and delivered to the trustee during the lifetime of the settlor or the person holding the power of revocation. If the trust instrument explicitly makes the method of

14.

revocation provided in the trust instrument the exclusive method of revocation, the trust may not be revoked pursuant to this paragraph."

Article V of the 2006 trust sets forth a method of revocation to be used during the settlors' lifetimes, but does not specifically address the method of revocation by a surviving spouse. The method stated in article V is simply "by an instrument in writing signed" by the settlors. Presumably, the method to be employed by a surviving spouse was intended to be essentially the same—that is, by an instrument in writing reflecting an intention on the part of the surviving spouse to revoke the trust. We agree with appellants that this is the most reasonable interpretation of article V of the 2006 trust, which appears to have been framed so as to easily facilitate revocation without the need of technical formalities or further approvals, requiring only that "[s]uch revocation shall be by an instrument in writing signed by the [settlors] and shall be effective upon signing without notice to any successor Trustee."

Here, as pointed out by appellants, Robert, while he was the surviving settlor and the sole trustee of the 2006 trust, executed several instruments in writing that clearly manifested his intention to replace or revoke the 2006 trust, including his execution of (1) the 2008 trust, (2) the deed transferring the Tehachapi home to the 2008 trust, and (3) the 2011 amendment to the 2008 trust. In section 1.1 of the 2008 trust, it was stated that Robert, as grantor, had conveyed and delivered to the 2008 trust the assets described in an attached schedule of trust assets. That schedule of trust assets reflected his transfer of substantial assets to the 2008 trust that were previously in the 2006 trust, including the Tehachapi home.[9] We conclude that the execution by Robert of the above described written instruments constituted a legally adequate means to revoke his share of the 2006

---

[9]    In addition, in 2011, Robert executed a new last will and testament, evincing his intention that all of his property go into the 2008 trust. As explained in *Gardenhire v. Superior Court* (2005) 127 Cal.App.4th 882, 894, although a will is excluded from the method of revocation authorized under section 15401, subdivision (a)(2), it is a permissible means under section 15401, subdivision (a)(1), if the trust allows revocation by a written instrument.

trust, since his action reasonably complied with the method of revocation provided in the 2006 trust (§ 15401, subd. (a)(1); see *Gardenhire v. Superior Court*, *supra*, 127 Cal.App.4th at p. 888), and/or complied with the alternative statutory method of revocation (§ 15401, subd. (a)(2)).[10]

## V.    Dispositional Issues

To reiterate our holdings and conclusions:  Pursuant to section 15400, the 2006 trust was revocable by Robert, as the surviving settlor, because the trust was not expressly made irrevocable.  Further, when Robert executed written instruments reflecting his intent to replace or revoke the 2006 trust, he used a legally sufficient method to accomplish a revocation.  (See § 15401, subds. (a)(1) & (2).)  However, because there was more than one settlor and the trust did not otherwise provide, the 2006 trust was revocable by Robert only as to his share or contribution of the 2006 trust. (§ 15401, subd. (b)(1).)  Assuming the 2006 trust consisted solely of community property contributions, Robert was entitled to revoke as to one-half of the trust corpus.  (*Powell*, *supra*, 83 Cal.App.4th at pp. 1440–1441.)

Here, because the trial court held that the 2006 trust became altogether irrevocable upon Anna's death and denied Robert any right to revoke as the surviving spouse, the trial court prejudicially erred and the judgment below must be reversed.

However, the ground of our reversal leaves certain matters to be resolved on remand.  In light of the fact that Robert was only able to revoke *his share* of the 2006 trust, it follows that he did not revoke the trust as to Anna's share of the trust assets.  This means that on remand, an allocation of assets between the two trusts will be necessary— i.e., some part of the property will have to be returned to the 2006 trust, while some part will remain in the 2008 trust.  On this point, appellants concede that a reversal on this

---

**10**    We do not believe the language of article V of the 2006 trust created an exclusive method of revocation, but, even if it did, we hold that Robert's action (executing the above written instruments) complied therewith.

16.

ground will require the return of one-half of the property to the 2006 trust that had been transferred into the 2008 trust from the 2006 trust, including one-half of the bank accounts and one-half of the Tehachapi home, and that an accounting of the 2006 trust assets is still necessary. Appellants' concessions on what is needed on remand are essentially correct, although we note the issue of whether Robert Lee Hunsaker's share of the 2006 trust assets was exactly one-half of the trust corpus presupposes that all of the assets were community property contributions, a fact that is not before us.

Our reversal herein leaves intact the following parts of the trial court's judgment that were proper forms of interim relief and were not inconsistent with our decision in this appeal: (1) the trial court's order for an accounting, (2) the trial court's decision to remove Charles Fluharty as a successor cotrustee of the 2006 trust, and (3) the order canceling the quitclaim deed wherein appellants purported to convey the Tehachapi home to Christopher Fluharty. Beyond this, of course, appellants will have to return to the 2006 trust that portion of the 2006 trust assets (presumably one-half) that Robert was *not* entitled to revoke and transfer to the 2008 trust. In that regard, we leave to the trial court to determine, on remand, any questions of how best to allocate the particular property or assets between the two trusts in a manner consistent with this opinion.[11]

---

[11]    The trial court may, of course, require further briefing and hearings to resolve such matters, including the results of the accounting.

17.

## DISPOSITION

The judgment of the trial court is affirmed with regard to its orders for an accounting, the removal of Charles Fluharty as a successor cotrustee of the 2006 trust, and the cancellation of the quitclaim deed conveying the Tehachapi home to Christopher Fluharty. In all other respects, the order of the trial court is reversed and the matter is remanded to the trial court for further proceedings consistent with this opinion. Costs on appeal are awarded to appellants.

_____
KANE, Acting P.J.

WE CONCUR:


_____
DETJEN, J.


_____
PEÑA, J.

18.