Filed 6/24/24  Barefoot v. Jennings CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| JOAN MAURI BAREFOOT, | F086185 |
| Plaintiff and Appellant, | (Super. Ct. No. PR11414) |
| v. | |
| JANA SUSAN JENNINGS et al., | **OPINION** |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Tuolumne County.  Hallie Gorman Campbell, Judge.

Tom F. Colman; Able & Monroe and David L. Monroe for Plaintiff and Appellant.

Jensen Nielsen Vande Pol, Eric T. Nielsen and Judy A. Jensen for Defendants and Respondents.

-ooOoo-

Joan Mauri Barefoot appeals after the probate court denied her motion for judgment on the pleadings and denied her petition seeking to set aside amendments to the Maynord 1986 Family Trust (the trust) made by her mother, Joan Maynord.[1] The trial court found that the trust permitted Joan to amend the trust as she saw fit and concluded Barefoot's challenge was procedurally barred. For the reasons set forth below, we affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

Robert and Joan married at some point prior to 1986. At that time, both had children of their own, with Robert having three and Joan having six. In March 1986, Robert and Joan created the trust. Consisting of some portion of the couple's community property, the trust was designed to provide income to Robert and Joan during their respective lifetimes and then to pass the community assets to their respective children.

Relevant to this case, the trust as originally written contains several provisions related to the couple, their plans for their assets, and the management of the trust. With respect to the property contained in the trust, Robert and Joan affirmed that all property placed in the trust was community property and should retain that character while in trust. This provision also states that any "power reserved to settlors to alter, amend, modify or revoke this trust, in whole or in part, is held by the settlors during their joint lifetimes in their capacity as managers of the community property." If the trust were revoked during Robert and Joan's joint lifetime, the "community property shall be returned to the settlors as their community property."

With respect to the death of either spouse, the trust notes that the "trustee shall continue to administer the trust estate … according to the terms of the trust set out in ARTICLES THREE, FOUR, FIVE and ELEVEN with respect to the surviving spouse

---

[1] For clarity, we will refer to Joan Maynord and her husband, Robert Maynord, by their first names. Joan and Robert are also referred to as the "settlors," "trustees," "spouse," and "surviving spouse" depending on the context.

and without distinction as to whether any property was derived from community property, separate property or quasi-community property."

The above-referenced article 11 provides instructions on revocation and amendment. Under that portion of the trust, "[d]uring the settlors' joint lifetimes, this trust may be revoked in whole or in part: with respect to community property, by a written instrument signed by either settlor and delivered to the trustees and the other settlor; and with respect to separate property, by a written instrument signed by the settlor who contributed that property to the trust and delivered to the trustees." Similarly, the "settlors may at any time during their joint lifetimes amend any terms of this trust by written instrument signed by both settlors and delivered to the trustees." Finally, on "the deceased spouse's death, the surviving spouse may amend, revoke or terminate the trust."[2] The trust also explains that on "the death, resignation or incapacity of either settlor, the other shall become sole trustee."

With respect to distribution after the death of the surviving spouse, the trust as originally written explains in article 7 that on "the surviving spouse's death, the trustee shall distribute any remaining balance of the trust estate … to one or more of the group consisting of the settlors' issue and on any terms and conditions, either outright or in trust, and in any proportion that the surviving spouse shall appoint by will or codicil specifically referring to and exercising this power of appointment." Further, on "the surviving spouse's death, if and to the extent that the surviving spouse shall not have effectively disposed of all property of the trust estate through a valid and effective exercise of a power of appointment, the trustee shall divide the trust estate into equal shares, one for each living child of the settlors, and one for each group of the living issue

---

[2]    The trust states that the surviving spouse's powers of "[r]evocation and amendment shall be made in the manner provided in ARTICLE NINE, Paragraph A." This provision was described as a typo, as article 9 only contains general definitions and unrelated trust protections. The proper reference would have been to the same article 11 the provision was contained within.

of a deceased child of the settlor," and those shares shall be distributed in line with further instructions.

In line with the terms of the trust as originally written, in 1992, Robert and Joan jointly amended article 8 to further describe the powers granted to the trustees—none of which are relevant to the current disputes. Sometime shortly thereafter, Robert died. Following Robert's death, in October 1993, Joan executed the 2d amendment to the trust. As explained in the introductory remarks, Joan sought "to delete" the original trust[3] and 1st amendment "in their entirety and replace them" with the terms of the 2d amendment.

The 2d amendment to the trust established a revokable trust controlled by Joan. After the 2d amendment, the trust intentionally omitted payments to Robert's children and granted Joan "the right at any time or times during the Trustor's life, to amend, alter or revoke this trust in whole or in part, or any provision thereof, by an instrument in writing signed by the Trustor and delivered to the Trustee." The trust would convert to irrevocable upon Joan's death.

From this point until her death, Joan made regular amendments to the trust. Beneficiaries were routinely modified, distributions increased and decreased, and several of Joan's own children were removed or added from the financial plan over time. The 3d amendment occurred in 1997. In total, there were 24 amendments by the time of Joan's death, with the last occurring in 2016. Within these, there were several instances where Joan deleted and restated the entire trust. Other modifications increased and decreased distributions to Joan's children, including Barefoot, and at times, named Barefoot as a successor trustee. Barefoot was granted a $20,000 disbursement through the 23d amendment but was excluded from any distributions in the 24th and final amendment. [4] Three of Joan's other children were also subjected to limited distributions.

---

[3]   "Original trust" refers to the trust as originally written and prior to amendments.

[4]   More specifically, in the 16th amendment, dated March 13, 2013, Joan provided her daughter, Barefoot, would serve as a trustee. Barefoot was removed as trustee and initially

The reduction in status allegedly occurred after Barefoot sent a letter to Joan discussing issues existing between them.

Joan died in August 2016. Shortly thereafter, Barefoot filed a petition to set aside the 17th through 24th amendments to the trust. Barefoot's petition was initially dismissed on standing grounds, but ultimately reinstated after appeal. (See *Barefoot v. Jennings* (2020) 8 Cal.5th 822, 825.)

After remand, the parties prepared for trial on the petition, submitting the various trust amendments and notes from the attorney that prepared the amendments to the court. Respondents filed their trial brief on November 10, 2022. Shortly thereafter, on November 14, 2022, Barefoot filed a motion to amend her petition, alleging she had learned new facts when she began representing herself roughly 60 days earlier. Barefoot alleged the amendment would relate back to the original petition because it was based on the same general set of facts.

On November 23, 2022, Barefoot filed what was described as her second amended petition to determine the validity of and set aside a purported trust amendment, among other relief. In this petition, Barefoot asserted that all amendments made to the trust since the 2d amendment were improper because they did not include "specific reference to the Power of Appointment" contained in the original trust document. If accepted, this position would result in the terms of the original trust remaining applicable and all nine children sharing some portion of the estate. At the same time, Barefoot dismissed with prejudice "all causes of action previously alleged relating to lack of capacity, undue influence and fraud."

On December 1, 2022, respondents Jana Susan Jennings and Shana Lee Wren filed a response to Barefoot's second amended petition, providing two core arguments. First,

---

provided with certain real property before having her share reduced to $20,000 in later amendments. It was not until March 17, 2016, that Barefoot was fully disinherited.

respondents raised an affirmative defense that the new claims were "barred by applicable statutes of limitation" and Barefoot was "aware of the substance of the Original Trust … [since 2007], but waited to pursue these new claims until after the applicable statute of limitation had expired." This claim was followed by roughly a page of facts on procedural background covering the prior five years of litigation. Respondents then argued that the new claim was functionally one of contract interpretation and that such a claim failed because even the original trust contained a provision stating, "the surviving spouse may amend, revoke or terminate the trust" upon "the deceased spouse's death."

Following this response, Barefoot moved for a judgment on the pleadings. Barefoot's argument paralleled the second amended petition, arguing the original trust required reference to the power of appointment to change beneficiaries and the 2d amendment to the trust did not satisfy that requirement. Barefoot further argued the trust was never revoked, "only amended" under the surviving spouse provision, but claimed the amendments were not proper because they did not specifically reference the power of appointment. Barefoot argued that Probate Code sections 630 through 632[5] thus controlled and prevented the amendments made.

In response, respondents noted Barefoot's acknowledgement that the trust permitted amendment after the death of the first spouse and pointed out that the trust was always amendable and revocable under any version considered. Such a fact resulted in the unavoidable claim that Joan had the right to amend both the trust as a whole and the appointment clause specifically. Respondents argued the language of the trust was unambiguous as to those terms and that it permitted the action Joan took.

The probate court heard the motion for judgment on the pleadings and held its trial on the second amended petition on January 18, 2023. The court identified the core issue as whether article 7 of the trust "should be interpreted in such a way as to invalidate

---

[5] Undesignated statutory references are to the Probate Code.

6.

unilateral attempts ([2]d amendment forward) by the surviving settlor, Joan Maynord." The court also noted that respondents sought to bar the second amended petition on statute of limitation grounds. The court noted Barefoot had never filed a response discussing the statute of limitation claim. The court explained it had received into evidence all of the relevant amendments and testimony from James Gianelli, the attorney who prepared the original trust documents. The court then turned to the statute of limitation issue.

On the statute of limitation defense, the court noted that Barefoot alleged Joan lost capacity to revoke or amend the trust by May 2013. The court noted that although the ability to contest any amendment was tolled at least until that date, the applicable statute of limitation required Barefoot to bring her claim within three years of learning of the amendments or within one year of Joan passing. Finding the claims were not raised until 2022, nine years after Barefoot allegedly lost capacity to make amendments, the court found the claims barred by laches, precluded by equitable estoppel arising from Barefoot accepting amendments that benefited her and, as of the 16th amendment, named her successor trustee, and ultimately, by the relevant statute of limitation.

The court then turned to the question whether article 7 actually barred Joan's ability to amend the trust. The court determined that although Joan received a power of appointment "over the whole of the trust res to redirect assets using a will and specific language … this was not the *only* authority she received as the surviving spouse." (Fn. omitted.) Rather, Joan was also given authority to control community property and authority to make any modifications or revisions to the trust after Robert's death. The court noted that any other reading would make the trust irrevocable upon Robert's death, a conclusion contradicted by "the express authority in Article Eleven (D) to amend and revoke after [Robert's] death." The court thus found Joan was not required to utilize the power of appointment contained in article 7—a power that could not trigger until her death—but rather could amend as she did through the powers granted in article 11. The

7.

court thus denied the second amended petition, effectively denying the request for judgment on the pleadings.

This appeal timely followed.

## DISCUSSION

Barefoot identifies two issues in this appeal. First, whether the trial court erred in failing to conclude the distribution plan of the original trust was never changed. Second, whether the court erred in finding the second amended petition barred by the statute of limitation and equitable estoppel. For the reasons set forth below, we reach only the first of these two issues and find that the trial court correctly determined that the contested 2d amendment was proper.

### *Standard of Review*

"The interpretation of a will or trust instrument presents a question of law unless interpretation turns on the credibility of extrinsic evidence or a conflict therein." (*Burch v. George* (1994) 7 Cal.4th 246, 254.) Where, as here, we do not rely on conflicting extrinsic evidence, the interpretation of a trust agreement is reviewed de novo. (*Estate of Powell* (2000) 83 Cal.App.4th 1434, 1439 (*Powell*).) "In construing a trust instrument, the intent of the trustor prevails and it must be ascertained from the whole of the trust instrument, not just separate parts of it." (*Scharlin v. Superior Court* (1992) 9 Cal.App.4th 162, 168.)

"On appeal, we review the probate court's ruling, not its reasons, and affirm if the ruling is correct albeit the reasons are not; we also resolve any ambiguities in favor of affirmance." (*Blech v. Blech* (2018) 25 Cal.App.5th 989, 999.)

### *Joan Properly Made the 2d Amendment*

The probate court's decision to effectively deny Barefoot's request for judgment on the pleadings and to ultimately deny Barefoot's second amended petition turned in part on the court's conclusion that the 2d amendment to the trust was proper under the terms of the original trust. On appeal, Barefoot contends the probate court erred in

determining the original trust could be amended by Joan in a manner that changed the designated beneficiaries without specifically invoking the power of appointment contained within that trust. Barefoot provides a series of analytical points culminating in a claim that the original trust and Probate Code mandate that the settlor utilize the power of appointment in any modification of the beneficiaries and, therefore, that the probate court was required to grant Barefoot's motion for judgment on the pleadings. We do not agree.

Unless governed by more specific internal mandates, a trust is amendable in the same manner as it is revokable. (See § 15402 ["Unless the trust instrument provides otherwise, if a trust is revocable by the settlor, the settlor may modify the trust by the procedure for revocation."].) Our Supreme Court recently explained that "a trust instrument that merely specifies a method of modification without limiting settlors to the use of that method does not preclude the use of the revocation procedures and therefore does not 'provide[] otherwise' from the general rule." (*Haggerty v. Thornton* (2024) 15 Cal.5th 729, 736 (*Haggerty*).)[6] Such an interpretation is consistent with "the preexisting rule that the power of revocation includes the power of modification, and thus an available method of revocation is also an available method of modification unless a trust term precludes the use of any method of revocation for modification."[7] (*Haggerty*,

---

[6] Barefoot relies heavily on *King v. Lynch* (2012) 204 Cal.App.4th 1186, disapproved of by *Haggerty*, *supra*, 15 Cal.5th 729 at page 742, for her argument that " 'unless the trust instrument provides otherwise' " indicates "that if any modification method is specified in the trust, that method must be used to amend the trust." The restrictive analysis contained in *King* was specifically rejected in *Haggerty* and eviscerates Barefoot's position.

[7] Notably the statutory grounds for revocation contained in section 15401 do not govern instruments executed before July 1, 1987. (§ 15401, subd. (e).) The trust was first executed in 1986 and is thus technically governed by the law existing prior to section 15401's enactment. As *Haggerty*, *supra*, 15 Cal.5th 729 at page 736 explains, however, the current statute is generally consistent with the preexisting rule, and neither party argues that the law existing prior to July 1, 1987, affects the outcome of this dispute. Thus, we analyze the issue from the perspective of section 15401 for simplicity.

at p. 738.)  Thus, merely providing different methods for revocation and amendment "would not preclude modification via any method of revocation."  (*Id*. at p. 740.)

Accordingly, unless the trust instrument specifically limits itself to only specific methods, a trust may be modified by "compliance with any method of revocation provided in the trust instrument" or by "a writing, other than a will, signed by the settlor … and delivered to the trustee during the lifetime of the settlor."  (§ 15401, subd. (a).)

In this case, the original trust contains several provisions related to revocation and modification.  Relevant to Barefoot's argument, article 7 grants the surviving spouse a power of appointment over the trust estate following the death of the deceased spouse. Under this power, upon the surviving spouse's death, the trust balance would be distributed "to one or more of the group consisting of the settlors' issue and on any terms and conditions … that the surviving spouse shall appoint by will or codicil specifically referring to and exercising this power of appointment."  Any undistributed trust residue would then be subject to division "into equal shares, one for each living child of the settlors, and one for each group of the living issue of a deceased child of the settlor."

Article 11, however, contains more specific and direct instructions.  Thus, during "the settlors' joint lifetimes," the trust could be revoked "in whole or in part:  with respect to community property, by a written instrument signed by either settlor and delivered to the trustees and the other settlor; and with respect to separate property, by a written instrument signed by the settlor who contributed that property to the trust and delivered to the trustees."  Amendments could be made "at any time during their joint lifetimes" through the use of a "written instrument signed by both settlors and delivered to the trustees."  Further, on "the deceased spouse's death, the surviving spouse may amend, revoke or terminate the trust."  None of these provisions stated they were the exclusive means for revocation or modification.

Under a plain reading of the terms of the original trust, there were two distinct revocation and modification plans while either settlor lived and one final option upon the

death of the surviving spouse.  While both settlors were alive, either could revoke the trust unilaterally with respect to their sole property or the community property held in the trust through a written document signed by the settlor and provided to existing trustees. And although not identified as an exclusive route, while both were alive, the settlors could jointly modify the trust through a signed instrument delivered to the existing trustees.  Once one of the settlors died, the surviving spouse was granted full authority to "amend, revoke or terminate the trust."  If no such amendments, revocations, or terminations occurred, then the trust would be distributed in equal shares unless the power of appointment contained in article 7 was properly invoked in the surviving settlor's will.

This plain reading fully supports the trial court's conclusion that Joan could properly amend the trust in any manner she saw fit after Robert's death.  Both the trust's defined methods for disclosing a revocation or modification and the statutory scheme permit amendments implemented through a written document delivered to the existing trustees.  According to the terms of the trust, upon "the death, resignation or incapacity of either settlor, the other shall become sole trustee."  Thus, upon Robert's death, the terms of the trust and the statutory scheme only required that Joan create a written document detailing any amendments and provide that document to herself.

Further, the record here shows that Joan did just that.  After Robert's death, Joan issued the 2d amendment to the trust.  This amendment deleted all terms contained in the original trust and its 1st amendment and replaced them with a new set of instructions. This document was signed by Joan in both her capacity as trustor and her capacity as trustee, demonstrating it had been properly disclosed under the terms of the original trust and the statutory scheme.

Based on the terms of the original trust and the actions demonstrated in the subsequent amendments, it is apparent that, following Robert's death, Joan did have the

authority to modify the trust in any manner she saw fit and that she did so through the 2d amendment.

In this appeal, Barefoot argues that the power of appointment contained in article 7 trumps the modification and revocation provisions contained in article 11. As this court's analysis shows, this argument fails under the plain reading of the trust because the power of appointment could not trigger until Joan's death, but all terms could be modified upon Robert's death. As such, the special power of appointment simply never became effective in a way that could limit Joan's authority to act.

Barefoot contends that such a reading renders the "special power of appointment" granted to Joan surplusage, as it could be overcome by a mere amendment at any time. To reach this position, Barefoot argues that the power to revoke the trust should be considered a separate "general" power of appointment which would allow Joan to disrupt her joint plan with Robert but only if she suffered any potential tax consequences of terminating the trust and having assets distributed to her. In all other cases, on the assumption that Joan would control only one-half of the community property held by Robert after his death, with Robert's estate holding the other half in the trust, Barefoot's argument contends that the trust would be effectively irrevocable such that Joan could only modify the planned distribution of both her and Robert's assets through the special power of appointment contained in article 7.

Barefoot's logical progression is flawed. First, it contradicts the plain reading of the trust provisions discussed above. In addition, it fails to account for the well-settled rule that a trust is revocable unless deemed irrevocable. (See § 15400 ["Unless a trust is expressly made irrevocable by the trust instrument, the trust is revocable by the settlor."].) The revocability of the trust is a critical flaw in Barefoot's argument, as a trust can "be revoked in whole or in part" according to the will of the settlor. (§ 15401, subd. (a).) Given the parallel nature of revocation and modification, the revocable nature of the trust in this case precludes any logical argument that a "special power of

12.

appointment" triggered only upon Joan's death could bar her from modifying the trust's beneficiaries while she was alive.[8] (See § 15402 ["Unless the trust instrument provides otherwise, if a trust is revocable by the settlor, the settlor may modify the trust by the procedure for revocation."].)

Further, Barefoot's argument relies on finding that a general provision controls over a more specific provision of the trust. In this case, the trust specifically and directly grants a power to modify or revoke the trust upon the death of one of the two settlors. Yet Barefoot's argument would mandate that this specific and broad power could not result in modification of a pre-existing distribution plan triggered by the surviving spouse's death, which itself could be modified by the surviving spouse's will—if not also by any statutory methods. It is a well-settled principle of contract interpretation that the specific will be given effect over the general and that all provisions should be interpreted to give effect to every part. (*Kashmiri v. Regents of University of California* (2007) 156 Cal.App.4th 809, 834.)

To consider Barefoot's framing of the issue requires this court to accept that it must discount either the power to modify after the death of one settlor or the power of the surviving spouse to modify by will upon her death. Our analysis finds these two provisions have no conflict given one is a broad power to amend and the other protects aspects of the original trust to the extent the power to modify has not been invoked. But to the extent conflict is alleged, it is clear that the power of appointment over distribution

---

[8]    We further note that the trust document as a whole recognized that after Robert's death, Joan had the right to disinherit not only her children but Robert's children, or vice versa should Robert have survived Joan. Although the arguments focus on the requirement in article 7, subdivision (a) that modifications be made by will or codicil, specifically referring to the relevant power, it is worth noting that the provision does not limit the surviving spouse to only disinheriting their own children. Rather, the surviving spouse is given full control over all assets and can disinherit the children of either spouse. This implies the specific power to modify the trust granted upon the death of the first spouse should not be drawn more narrowly, as it would be incongruent with the intent to allow disinheritance expressed in article 7 to require that action be hidden until the reading of one's will when other modifications are permitted.

is the more general power and the power of amendment by the surviving spouse is the more specific with respect to whether and to what extent the surviving spouse may amend the trust's provisions.

Finally, we do not find Barefoot's citation to *Powell*, *supra*, 83 Cal.App.4th 1434 persuasive on the claim that Robert's estate retained a separate property interest in a portion of the community property held by Robert at his death. While *Powell* holds that a settlor's death results in a transmutation of community property held by that settlor, it does not set forth a rule of law that holds a trust cannot determine how to deal with such property. (*Id*. at p. 1441.) Rather, as noted in *Powell*, the deceased spouse specifically transferred separate property into the 1991 trust by will to be disposed of in accordance with the provisions of the 1991 trust. (*Ibid.*) With no provisions of the 1991 trust modifying this intent, the court found only one-half of the trust—that portion that remained community property—could be revoked after the first spouse's death. (*Ibid*.)

In this case, the trust at issue contains several provisions that separate it from the 1991 trust in *Powell*. The first set of provisions focus on the nature of the property in the trust. The trust states that all property "shall retain its character" as "community property," "notwithstanding the transfer to this trust." And upon revocation, "this community property shall be returned to settlors as their community property and not as the separate property of either both settlors."

The next set of provisions focus on the death of one spouse. In these, "the trustee shall continue to administer the trust estate, including any additions made to the trust by reason of the deceased spouse's death, such as from the decedent's will or life insurance policies on the decedent's life, according to the terms of the trust … and without distinction as to whether any property was derived from community property, separate property or quasi-community property." The surviving spouse retains power to direct "payments out of the trust estate to any other person or organization" as they deem fit.

14.

The third set of provisions, discussed previously, note that upon the deceased spouse's death, the surviving spouse may amend, revoke, or terminate the trust, and that upon revocation, "all assets of the trust shall be delivered to the surviving spouse." Further, in addition to this power, the surviving spouse is granted the disputed power of appointment, allowing them to dispose of all property within the trust by will if not otherwise disposed.

Taken together, these provisions show the trust in this case is substantially and materially different than the 1991 trust in *Powell*. In this case, the parties clearly intended that the surviving spouse would have unilateral control over all assets in the trust, regardless of their source, and that such control would include the ability to modify the trust in any way the surviving spouse saw fit, including modifications that would change the original planned distribution if no changes were made. It was therefore not a contract between the parties to leave property to all nine children unless done so exclusively through a will, as Barefoot argues. This contrasts with *Powell*, where assets of the deceased spouse were added to the 1991 trust by will and in a manner showing an intent that those separate assets would be distributed according to the terms of the 1991 trust.

In conclusion, as the trust was properly modified prior to the point the power of appointment could protect the distribution plan contained in the original trust, this is not a case where the rules governing powers of appointment control. We therefore find no need to consider sections 630 through 632 or any of the case law discussing how such a power is properly exercised. Since the power was properly removed from the original trust as of the 2d amendment, it was never a bar to Joan's distribution plans.

We thus find no error in the probate court's conclusion that Barefoot was not entitled to judgment on the pleadings or in the probate court's ultimate determination that Barefoot's petition should be denied. Accordingly, we need not reach alternative grounds

15.

by which the court's order could be affirmed, such as the statute of limitation and timeliness issues raised by Barefoot.

## DISPOSITION

The trial court's May 2, 2023 final order and judgment is affirmed. Costs are awarded to respondents.


HILL, P. J.

WE CONCUR:


POOCHIGIAN, J.


MEEHAN, J.

16.